**ODYSSEY RE (LONDON) LIMITED, Plaintiff,**

v.

**STIRLING COOKE BROWN HOLDINGS LIMITED, Stirling Cooke Brown Insurance Brokers Limited, Stirling Cooke Brown Reinsurance Brokers Limited, Stirling Cooke Brown North American Holdings Limited, Stirling Cook Brown North American Reinsurance Intermediaries Inc., Nicholas Brown, Raydon Underwriting Management Company Limited, Jeh Re Underwriting Management (Bermuda) Limited, Reginald Billyard, Web Management LLC, Euro International Underwriters Limited, John Hubert Whitcombe, and Christopher R. Henton, Defendants.**

No. 99 Civ. 2326(NRB).

United States District Court, S.D. New York.

Feb. 25, 2000.

Thomas R. Manisero, Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., New York City, for plaintiff.

Robert S. Frank, West Lawrence, NY, for Jeh Re Underwriting Management (Bermuda) Ltd., Reginald Billyard, defendants.

## OPINION AND ORDER

BUCHWALD, District Judge.

The plaintiff, Odyssey Re (London) Limited ("Odyssey"), a London-based corporation engaged in the business of insurance and reinsurance, brought this action against the defendants, a group of British and Bermudan insurance and reinsurance companies, their subsidiaries, and a number of individual principals of those companies. Odyssey asserts three counts against the each of the various defendants: (1) common law fraud; (2) violation of the Racketeer Influenced & Corrupt Organizations Act ("RICO" or the "Act"), 18 U.S.C. § 1962(c); and (3) violation of RICO's conspiracy provision, 18 U.S.C. § 1962(d). In brief, plaintiff alleges that the defendants engaged in an international conspiracy to fraudulently induce Odyssey to reinsure drastically unprofitable worker's compensation policies. Currently pending are several motions to dismiss this action based on various grounds.

A brief description of the named defendants in this case is necessary to begin this

opinion.[1] The first group of defendants are Euro International Underwriters Limited ("Euro"), John Hubert Whitcombe ("Whitcombe"), and Christopher R. Henton ("Henton"), collectively the "Euro defendants." According to plaintiff's Amended Complaint,[2] Euro is "a corporation that Whitcombe and Henton began operating under English law in February 1997, and maintains its principal place of business [in] London, England." Comp. ¶ 17. Both Henton and Whitcombe, the Amended Complaint alleges, reside in Essex, England and are "citizen[s]" (or, more accurately, subjects) "of the United Kingdom." Id. ¶¶ 18–19. Whitcombe "approached Odyssey through Horace Holman International ("Holman"), a London broker, and requested Odyssey to extend [b]inding [a]uthority to him" to enter into reinsurance contracts on Odyssey's behalf. Id. ¶ 37. Whitcombe and Henton presented Odyssey with a "Background Report," a "Business Plan," and various other representations to entice Odyssey into conferring Whitcombe and Henton with the binding authority. Id. ¶¶ 38–43. Accepting the allegations of the Amended Complaint as true, Whitcombe and Henton apparently started Euro as a vehicle to solicit reinsurance on behalf of Odyssey.

· The second group of defendants are Stirling Cooke Brown Holdings Limited ("SCB Holdings"), Stirling Cooke Brown Insurance Brokers Limited, Stirling Cooke Brown Reinsurance Brokers Limited, Stirling Cooke Brown North American Holdings Limited, Stirling Cooke Brown North American Reinsurance Intermediaries, Inc., and Raydon Underwriting Management Company Limited, collectively the "SCB Defendants." SCB Holdings, the parent company, is a Bermudan company whose securities are traded publicly in the United States on the NASDAQ exchange market. Comp. ¶ 8. The other SCB defendants are some of SCB Holdings' subsidiaries throughout Britain, Bermuda, and the United States, all engaged in the business of selling insurance and reinsurance. Id. ¶¶ 9–11, 13. Additionally, the Amended Complaint names as a defendant Nicholas Brown, the "principal shareholder and controlling person of SCB Holdings" who "resides in England and Bermuda." Id. ¶ 12. According to the Amended Complaint, the SCB defendants agreed to "direct substantial volumes of [worker's compensation reinsurance] business" to the Euro defendants. Id. ¶ 37. Plaintiff alleges that this business took the form of "guaranteed loss contracts" that the Euro defendants would in turn pass on to Odyssey through the mechanism of the binding authority. Id. ¶ 36.

The third group of defendants is JEH Re Underwriting Management (Bermuda) Limited ("JEH") and its principal, Reginald Billyard ("Billyard"), collectively the "JEH defendants." Billyard is a resident of Bermuda and JEH maintains its offices there. Comp. ¶¶ 14–15. The Amended Complaint alleges that Billyard, a longtime business associate of SCB Holdings' Brown, served as "managing general underwriter" for John Hancock Mutual Life Insurance Company of America ("John Hancock"), and agreed to pass on John Hancock's worker's compensation liability, ultimately to Odyssey through the SCB defendants and Euro's binding authority. Id. ¶¶ 23–27.

The final defendant is Web Management, L.L.C., a Connecticut-based compa-

---

1. Where a motion to dismiss is addressed on pleadings and affidavits alone, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party. *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir.1993). The Court must accept as true all of the well pled facts alleged in the complaint. *See, e.g., Atlantic Mutual Insurance Co. v. Balfour Maclaine International Ltd.*, 968 F.2d 196, 198 (2d Cir.1992); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985).

2. Plaintiff's Amended Complaint, dated August 16, 1999, will hereinafter be ·cited as "Comp."

ny partly owned by SCB Holdings. Comp. ¶ 16. According to the Amended Complaint, Chuck Bastàn, one of the principals of Web, was a former colleague of Billyard's when they were both in the employ of yet another company, Duncanson & Holt. *Id.* ¶ 24. Web's other principals, Robin Ekwall and Steven Wright, were involved with transactions involving SCB entities when they were employed by Phoenix Home Life and Phoenix American Life. *Id.* ¶¶ 23–24. Web served as managing general underwriter for All American Life Insurance Company, U.S. Life Insurance Company, and Trustmark Insurance Company. *Id.* The Amended Complaint alleges that Web was able to reinsure those companies' liability almost exclusively through other unspecified defendants, and that much of this liability was eventually ceded to Odyssey through Euro's binding authority. *Id.* ¶¶ 23–25, 33–38.

Defendant's have moved to dismiss as follows: the Euro defendants, SCB Holdings, Raydon, and the JEH defendants based on the ground of lack of personal jurisdiction (Fed.R.Civ.P.12(b)(2)); the Euro defendants, SCB Holdings, and Raydon based on insufficient service of process (Fed.R.Civ.P.12(b)(5)); and all defendants based on the grounds of lack of subject matter jurisdiction (Fed.R.Civ. P.12(b)(1)) and insufficient pleading of the RICO and fraud counts (both Fed.R.Civ.P. 9(b) and 12(b)(6)). Additionally, the Euro and SCB defendants have moved to dismiss based on the doctrine of *forum non conveniens.*[3] Defendant Nicholas Brown has not responded to plaintiff's Amended Complaint in any way.[4] Plaintiff, of course, disputes each of these grounds.[5]

## Background

Reinsurance is a contractual arrangement whereby one insurer (the "ceding insurer" or "reinsured") transfers, or "cedes" all or part of the risk it underwrites pursuant to a policy or group of policies to another insurer. *See Colonial American Life Insurance Co. v. Commissioner,* 491 U.S. 244, 246–248, 109 S.Ct. 2408, 105 L.Ed.2d 199 (1989); *Unigard Security Insurance Co. v. North River Insurance Co.,* 4 F.3d 1049, 1053 (2d Cir.1993). "The purpose of reinsurance is to diversify the risk of loss ... and to reduce required capital reserves. Spreading the risk prevents a catastrophic loss from falling upon one insurer." *Unigard Security,* 4 F.3d at 1053 (internal citations omitted). "Reinsurance is simply an insurance policy issued to an insurer." *Employers Insurance of Wausau v. American Centennial Insurance Co.,* No. 86 Civ. 8576, 1989 WL 6631, at *1 (S.D.N.Y. Jan. 24, 1989). "Pursuant to the reinsurance contract, the reinsurer agrees to indemnify the ceding insurer in return for a portion of the premium on the risk transferred." Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes,* § 13.01[a] (1990) (citing, *inter alia, Trans-*

---

3. Hereinafter, the defendants' memoranda of law and reply briefs in support of their motions to dismiss plaintiff's Amended Complaint will be cited as follows: the Euro defendants ("Euro Mem." and "Euro Reply"), the SCB defendants ("SCB Mem.," "SCB Supp." and "SCB Reply"), the JEH Defendants ("JEH Mem." and "JEH Reply"), and Web ("Web Mem." and "Web Reply").

4. Even though defendant Brown did not enter an appearance in this case or join in the motion to dismiss, *sua sponte* dismissal with respect to him is appropriately considered if the issues are substantially the same as those concerning the other defendants, and plaintiff had notice and full opportunity to make out

its claim against Brown. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 6 (2d Cir.1990). Because Brown is a principal of the SCB defendants, against whom Odyssey has fully litigated this claim, and because, as a British and Bermudan resident (Comp. ¶ 12), he is similarly situated to the other defendants with respect to the discussion below, we find that he is properly considered in terms of the other defendants' motions to dismiss.

5. Plaintiff's memorandum of law in opposition to defendants' motions to dismiss the Amended Complaint will hereinafter be cited as "Pl.Mem."

*continental Underwriters Agency, S.R.L. v. American Agency Underwriters,* 680 F.2d 298, 299 n. 2 (3d Cir.1982); *Delta Holdings, Inc. v. National Distillers and Chemical Corp.,* No. 85 Civ. 3439, 1988 WL 36330, at *1–3 (S.D.N.Y. Apr.11, 1988)).

According to the Amended Complaint, "[i]n or about mid–1996, Whitcombe and Henton [the principal Euro defendants] agreed with Brown and the "Stirling Cooke entities"[6] that if Whitcombe and Henton would identify and secure [binding] authority to act on behalf of a financially sound, U.S. qualified [target] reinsurer,[7] the [other defendants] would direct substantial volumes of business to Whitcombe and Henton, from which they would derive tremendous personal income." Comp. ¶ 37.

The plan worked as follows: First, the managing general underwriters ("MGU's") who were part of the enterprise (JEH, Web, and several of the SCB subsidiaries) would seek out and reinsure "materially under priced reinsurance" from U.S. workers' compensation insurers. *Id.* ¶ 35. Then, Whitcombe and Henton would "retrocede," or pass that liability from the MGU's to the unknowing target reinsurer through the binding authority in such a way that "was structured to guarantee the purchaser [and the underwriter] a profit." *Id.* Finally, the target reinsurer would be left beholden to the original insurer for a "guaranteed loss contract" for which "massive losses are inevitable." *Id.* ¶ 36. It was key to the plan that the deals be structured in such a way that "created the illusion of profitability," "delayed the inevitable presentation of these vast losses to the true risk bearers," and "provided a further source for generation of risk-free income for the defendants." *Id.*

Plaintiff alleges that in mid–1996, Whitcombe approached Odyssey in England, through Holman, a London-based intermediary, to convince Odyssey to extend it binding authority. *Id.* ¶ 37. Later that fall, Whitcombe and Henton presented Odyssey with a "Background Report," allegedly prepared with the assistance of other unspecified defendants, setting out the scope of the account they proposed to create for Odyssey though Holman in London. *Id.* ¶ 38. Whitcombe and Henton followed up with a "Business Plan," on November 1, 1996 which "confirme[ed] and reiterat[ed] the earlier representations," *id.* ¶ 39, as well as "further discussions" in which they made various other representations designed to entice Odyssey into signing off on the binding authority. *Id.* ¶¶ 40–43.

On January 27, 1997, Odyssey signed Whitcombe's proposed binding authority. *Id.* ¶ 43.[8] Whitcombe and Henton then formed Euro in February of 1997. *Id.* ¶ 17. Odyssey alleges that, with the binding authority in hand, the Euro defendants committed Odyssey to a series of disastrously unprofitable, but deceptively structured reinsurance contracts. Odyssey further alleges that the Euro defendants induced it on February 11, 1998, to extend the binding authority to June 30, 1999, by masking the nature of the agreements entered into under the binding authority. *Id.* ¶¶ 56–59.

In its Amended Complaint, Odyssey offers examples of agreements which are "representative of defendants' manipulative practices." *Id.* ¶ 48. Of particular importance to this discussion are: the "Spiral Contracts," under which Euro bound Odyssey to assume $20 million worth of insurance liability that Euro re-

---

**6.** Construing plaintiff's Amended Complaint liberally, the "Stirling Cooke entities" includes all the other defendants.

**7.** Odyssey is licensed as an "excess and surplus lines insurer" in 47 states and "accredited" as an reinsurer in 28 states. Comp. ¶ 7.

**8.** According to Whitcombe's September 28, 1999 Declaration, as well as the face of the binding authority agreement appended thereto (marked as "Exhibit 1"), the agreement was signed on January 22, 1997.

ceived from the Bermudan JEH defendants and the multinational SCB defendants throughout 1997, *id.* ¶¶ 48–55; the December 24, 1997 "Christmas Eve Placements," under which Euro retroceded to Odyssey an amount of liability that it had "actively concealed," *id.* ¶ 60; the June 19, 1998 "Unicare Retrocession," under which Euro committed Odyssey to assume "an estimated $42 million of losses" previously insured by various SCB defendants and Web, *id.* ¶¶ 68–69; the April 9, 1998 "Clarendon/Hallmark Retrocession," under which SCB defendants coordinated to retrocede an as yet unrealized amount of liability from the SCB entities and Web to Odyssey through Euro, ¶¶ 70–72; ·and the May 1998 "Web Variable Quota Share Retrocession," under which Euro signed up Odyssey to indemnify additional yet unrealized liability from SCB entities, some of which those SCB entities had earlier accepted from Web. *Id.* ¶ 73. The Amended Complaint lists other various retrocessions by which SCB and JEH defendants were able to pass on liability to Odyssey through Euro. *Id.* ¶¶ 61–66, 74–82.

Plaintiff, which was subsequently acquired by a new parent company, filed this suit on March 29, 1999. In late April and early May of 1999, defendants offered an initial set of motions to dismiss· plaintiff's complaint, which were fully briefed and set down for .oral argument before Judge Lewis A. Kaplan of this Court on June 28, 1999.[9] At that hearing, Judge Kaplan preemptively offered plaintiff the opportunity to replead the complaint in response to the deficiencies pointed out by defendants in their briefs and during argument. He specifically warned plaintiff that "having given [Odyssey the] opportunity [to replead] now," he was "not so sure [he] would give it to [Odyssey] again."[10] Tr. 59.[11] By letter, plaintiff accepted Judge Kaplan's offer and filed the Amended Complaint on August 16, 1999. Defendants filed the instant renewed round of motions to dismiss in late September and early October of 1999.

### Discussion

In most cases, the correct sequence in analysis commences with jurisdiction, proceeds to *forum non conveniens,* and finally to the underlying substantive issues. *See, e.g., Syndicate 420 at Lloyd's London v. Early American Insurance Co.,* 796 F.2d 821, 826–27 n. 8 (5th Cir.1986) ("This is so because *forum non conveniens* is a doctrine which permits a court to decline to exercise jurisdiction already vested."). This case differs from garden-variety *forum non conveniens* analysis, though, in that there are defendants who challenge the exercise of jurisdiction in this forum and another who contests its exercise in the proposed alternative forum. Web, an American company, contests the exercise of jurisdiction in Britain, while seven defendants challenge its exercise here.[12]

▮▮▮▮ "[I]n order to grant a motion to dismiss for *forum non conveniens,* a court must satisfy itself [among other things] that litigation may be conducted elsewhere against all defendants." *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74 (2d Cir.1998). Because of this strain of

---

**9.** The case was subsequently reassigned to me on October 14, 1999.

**10.** Judge Kaplan also warned plaintiffs, "I understand the law about amendment of pleadings, but I am not a hundred percent persuaded that the fact that leave to amend ordinarily ought to be granted freely requires in all cases that a party who has unsuccessfully litigated a motion to dismiss, where the *complaint is over 80 pages and the motions are in the hundreds if not thousands of pages* and who has been given an opportunity, after oral argument, to amend in light of everything the defendants have said, would require leave to amend after putting the Court to the burden of deciding the motion."

**11.** "Tr." refers to the transcript of oral argument before Hon. Lewis A. Kaplan on June 18, 1999.

**12.** The Bermudan JEH defendants have also formally refused to consent to jurisdiction in Britain, but for reasons that will be discussed *infra,* this refusal is merely illusory.

case law, we suspect that the British plaintiff, Odyssey, added the American Web to its list of mostly foreign defendants for the sole purpose of thwarting a *forum non conveniens* motion and keeping the case in the United States, where plaintiff would benefit from liberal rules of discovery and RICO's treble damage provision. However, "any potential problem [is] cured [when] individual defendants are dismissed [and] are no longer parties before the court." *Id.* at 74. For that reason, and since there is no jurisdictional impediment, we will proceed with the analysis of Web's substantive motion to dismiss before proceeding with the *forum non conveniens* analysis as it pertains to the rest of the defendants.[13]

For the reasons stated below, the motion of Web to dismiss plaintiff's charges against it is granted outright, and the motions of the SCB and Euro defendants to dismiss the remainder of the complaint on

the grounds of *forum non conveniens* are granted on the conditions set forth.

### A. Web's Motion to Dismiss

Web brought its motion to dismiss all three counts of Odyssey's Amended Complaint: common law fraud, RICO's § 1962(c) substantive provision, and the Act's § 1962(d) conspiracy provision. It should be remembered that Web is American company who served as managing general underwriter to United States-based insurance companies to reinsure policies that ultimately ended up being reinsured by other international defendants and, eventually, the plaintiff. The thrust of Web's argument is that Odyssey has failed to state a claim for which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) and failed to plead with particularity under Rule 9(b).[14] We will address each of plaintiff's claims against Web in turn.[15]

**13.** We also note that our *forum non conveniens* analysis may proceed without a preliminary determination of personal jurisdiction because, even if we could not find personal jurisdiction over the defendants, we could still order the case to be transferred to a more convenient forum in the interests of justice. *Syndicate 420*, 796 F.2d at 826–27 n. 8 (It is "one of the rare cases in which the District Court properly could proceed to resolve the *forum non conveniens* issue first, without the need to address the jurisdictional contest" because the forum analysis will leave the remaining defendants "similarly situated"). *Cf. Stein v. Microelectronic Packaging, Inc.*, 1999 WL 540443, at *7 (S.D.N.Y. July 26, 1999); *Garrel v. NYLCare Health Plans, Inc.*, No. 98 Civ. 9077, 1999 WL 459925, at *4–9 (S.D.N.Y. June 29, 1999); *Malone v. Commonwealth Edison Co.*, 2 F.Supp.2d 545, 547 (S.D.N.Y. 1998) (all finding that courts have the power to transfer cases under U.S. venue statutes even without personal jurisdiction).

**14.** Although Web listed the ground of lack of subject matter jurisdiction in its notice of motion, it only minimally briefed the issue in its supporting memorandum (Web Mem. at 23–24), citing instead to the work of another defendant (SCB Mem. at 25–29). Presumably, this was in response to Judge Kaplan's July 1, 1999 Order directing defendants "to use their best possible efforts to file a single joint brief." Regardless, Web's subject mat-

ter jurisdiction ground necessarily fails. First, this Court would have subject matter jurisdiction over Odyssey's common law claim against Web because Odyssey, a British company, could bring this claim against Web, a Connecticut company, under diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(2). Second, the cases cited by Web directly and by reference address RICO's extraterritorial application. *See, e.g., North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1050–51 (2d Cir. 1996). These cases are clearly distinguishable because the defendants were foreign, not American. Moreover, Odyssey's allegations raise the specter that Web may have used the United States as a "base" for the "manufacturing" and "export" of fraudulent devices. *See, e.g., id.* at 1051.

**15.** RICO claims are often dealt with before common law claims because it is appropriate for courts to decline jurisdiction over the common law claims where the substantive federal RICO claims are dismissed before trial. *See Medgar Evers Houses Tenants Association v. Medgar Evers Houses Associates, L.P.*, 25 F.Supp.2d 116, 124 (E.D.N.Y.1998) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). However, here, as discussed *supra* in note 14, diversity jurisdiction exists for the common law claim in any event. As a result, for the sake of clarity, we will proceed with the common law fraud claim first.

### 1. *Common Law Fraud*

█ It is basic to the Court's analysis of common law fraud to determine first what state or nation's law should be applied.[16] Initially, this Court would apply New York's conflict of law rules to the substance of the non-RICO common law fraud claim. *PT United Can Co. v. Crown Cork & Seal Co.*, No. 96 Civ. 3669, 1997 WL 31194, at *9 (S.D.N.Y. Jan.28, 1997) (citing *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 316 (2d Cir.1983)) *aff'd*, 138 F.3d 65 (2d Cir.1998). Under New York conflicts of law principles, fraud claims are governed by the state in which the injury is deemed to have occurred, "which is usually where the plaintiff is located." *Telecom International America, Ltd. v. AT & T Corp.*, 67 F.Supp.2d 189, 207 n. 16 (S.D.N.Y.1999) (quoting *Pinnacle Oil Co. v. Triumph Oklahoma, L.P.*, No. 93 Civ. 3434, 1997 WL 362224, at *2 (S.D.N.Y. June 27, 1997)). *Accord Robinson v. Avis Rent–A–Car, Inc.*, No. 98 Civ. 4321, 1999 WL 342037, at *3 (E.D.N.Y. May 24, 1999); *Trionic Associates, Inc. v. Harris Corp.*, 27 F.Supp.2d 175, 182 n. 7 (E.D.N.Y.1998). Here, the alleged injury is to Odyssey, which is located in England. As such, British law should govern the substance of plaintiff's common law fraud claim.

█ However, although British law must govern the overall structure of Odyssey's fraud claim, we must undertake an additional analysis to determine what law governs the specific issue of the nature of the duty Web may have owed to Odyssey. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 785–86 (2d Cir.1999) (remanding fraud case back to district court because it had not addressed question of whether New York or Puerto Rico law applied to the fiduciary duty/duty to disclose at issue). This determination is particularly important because American attitudes toward the duties owed by parties to a reinsurance arrangement may differ from those under British law. *See American Special Risk Insurance Co. v. Greyhound Dial Corp.*, No. 90 Civ.2066, 1996 WL 551659, at *85 (S.D.N.Y. Sept. 26, 1996) (noting the difference between "United States law" and "English law" on the question of duties owed between a reinsured and a reinsurer).[17]

In *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, National Association*, 731 F.2d 112, 120–21 (2d Cir.1984), the Second Circuit analyzed whether a breach of fiduciary duty claim would be governed by British, Chilean, New York or Nebraska law. Even though the plaintiff in that case was English, the Court concluded that New York law should apply to the breach of duty claim because all of the acts complained of took place in New York and New York has a substantial interest in preventing torts by banks operating within its jurisdiction. *Id.* Here, Web is a Connecticut corporation doing business in the American reinsurance industry. As a general proposition, the duties owed by American reinsurance companies such as Web must be governed according to one set of rules. *Cf. BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F.Supp.2d 123, 129 (S.D.N.Y.1999) (claim of breach of fiduciary duty to a corporation governed by law of the state where corporation was incorporated). The United States has the greatest substantive interest in determining that standard.[18] As such, American

---

**16.** The binding authority agreement apparently had no choice of law provision.

**17.** *Compare MacGillivray on Insurance Law* §§ 33–29 (Nicholas Legh–Jones, gen. ed., 9th ed.1999) (reciting that under British law, the "duty to act with the utmost good faith applies to reinsurance contracts" and "ought to be measured by the same standard expected of the original insured") *with Unigard Security*, 4 F.3d at 1065 (noting that the trend in American reinsurance law is "that utmost good faith does not accurately describe the modern relationship of sophisticated insurers bargaining at arms length").

**18.** We could ascertain no relevant difference between the way different states have applied to duties owed in the reinsurance industry. *Compare Unigard Security*, 4 F.3d at 1054, 1064–65 (describing the deterioration of duties owed between reinsurance entities

law governs the duty Web owed to Odyssey even though, overall, intentional torts against Odyssey may be governed according to British law.

Finally, for the purposes of evaluating the sufficiency of plaintiff's fraud pleadings, it is Rule 9(b) of the Federal Rules of Civil Procedure that governs. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Securities Litigation*, 9 F.3d 259, 265 (2d Cir.1993); *Stamm v. Barclays Bank of New York*, 960 F.Supp. 724, 729–30 (S.D.N.Y.1997).

### a. *Rule 9(b) Analysis*

■ Allegations of fraud must be pled with sufficient particularity to serve the three goals of Rule 9(b), namely: (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *Segal v. Gordon*, 467 F.2d 602, 606–07 (2d Cir.1972); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 285–86 (S.D.N.Y.1998).

■ "To pass muster [under Rule 9(b) ] in this Circuit, a complaint 'must allege with some specificity the acts constituting fraud' ...; conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Lobatto v. Berney*, No. 98 Civ.1984, 1999 WL 672994, at *9 (S.D.N.Y. Aug.26, 1999) (quoting *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982); *Rodman v. Grant Foundation*, 608 F.2d 64, 73 (2d Cir.1979)). Specifically, Rule 9(b) requires plaintiffs to allege "(1) the specific statement or omis-

sion; (2) the aspect of the statement or omission that makes it false or misleading; (3) when the statement was made; (4) where the statement was made; and (5) which defendant was responsible for the statement or omission." *Lobatto*, 1999 WL 672994, at *9; *Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356, 1997 WL 214957, at *15 (S.D.N.Y. Apr. 29, 1997).

■ In cases where the alleged fraud consists of an omission and the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud. *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 101 (S.D.N.Y.1997); *Adler v. Berg Harmon Assoc.*, 816 F.Supp. 919, 924 (S.D.N.Y.1993). In this case, plaintiff does not allege that Web made any statements directly to Odyssey, let alone any that directly contained falsehoods or misrepresentation.

■ When fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts or omissions complained of by each defendant. *Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 640 (S.D.N.Y.1999) (citing, *inter alia, Manela v. Gottlieb*, 784 F.Supp. 84, 87 (S.D.N.Y. 1992)). *See also Pallickal v. Technology International, Ltd.*, No. 94 Civ. 5738, 1996 WL 153699, at *1 (S.D.N.Y. Apr.3, 1996) ("[w]here there are multiple defendants, a complaint must identify which defendant is responsible for which act"). In *Skydell v. Ares–Serono S.A.*, 892 F.Supp. 498, 501–02 (S.D.N.Y.1995), this Court (Duffy, J.) dismissed a claim against one of two co-

based on citations to decisions in New York, Illinois, and New Jersey) *with Hartford Steamboiler Inspection and Insurance Co. v. Industrial Risk Insurers*, No. CV94–705105, 1995 WL 645971, at *21 (Conn.Super. Oct. 26, 1995) (expressing similar skepticism as to the extent of fiduciary duties between parties to a

reinsurance arrangement with reference to comparable fiduciary relationships under Kansas, as well as Connecticut law). *See also American Special Risk*, 1996 WL 551659, at *85 (referring only to "United States law" on this topic).

defendants where the complaint failed to sufficiently allege that the dismissed defendant "itself committed any misrepresentations or non-disclosures."

Similarly, in *Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)*, 747 F.Supp. 922, 938–39 (S.D.N.Y.1990), the court dismissed common law fraud claims against third-party defendants based on the "view that at the very least, Rule 9(b) requires some identification of specific alleged misrepresentations or omissions in the financial statements supplied to [the plaintiff]" and "[n]either the main complaint nor third-party complaint" sufficiently alleged facts that could support the inference that the third-party defendants were aware what was in the contents of the allegedly fraudulent financial statements. *Cf. Weinberger v. Kendrick*, 451 F.Supp. 79, 83 (S.D.N.Y. 1978) ("Although plaintiffs have alleged the manner in which [the information provided] was false or misleading, they have omitted assertions crucial to the vitality of the claim, [to wit], nowhere do the pleadings provide the approximate amount of the [consolidated financial statements'] overstatement, notice of which defendant is entitled.").

■ With these requirements in mind, we find that plaintiff's allegations are deeply flawed. Of the specifically delineated transactions which plaintiff claims are "representative of defendants' manipulative practices," Comp. ¶ 48, only four somehow involve Web. Although the pleadings regarding these four agreements do contain a smattering of statistics and industry jargon, they do not approach the level of specificity (as applied to Web) required by Rule 9(b). For example, Odyssey's pleading regarding the "Christmas Eve Placements" alleges that the defendants collectively "concealed from Odyssey information concerning the loss history and certain unprofitability of these transactions." Comp. ¶ 60. At a minimum, 9(b)

means that plaintiffs may not maintain an action in fraud by simply alleging a failure to disclose "information." And for the reasons discussed above, it is insufficient to make such an allegation against defendants collectively. *See Ellison*, 36 F.Supp.2d at 640.

Reading plaintiff's "Unicare Retrocession" pleadings generously, plaintiff maintains that Web was aware that: (a) "75% of the losses would be transferred to Odyssey;" (b) the original insurer would keep 57% of the premium; (c) Odyssey's losses would exceed $42 million; (d) Web would derive "substantial management fees for 'underwriting the transaction;'" and (e) the specific amounts that the other intermediaries would make on the transaction. Comp. ¶ 69. However, the Amended Complaint does not directly allege that Web omitted to inform Odyssey of these "facts." Rather, according to the Amended Complaint, they are merely "illustrative of how a cession could be structured to generate a guaranteed profit to All American and loss to Odyssey."

■ Even if Odyssey had pled that these were fraudulently omitted facts, Odyssey still has not distinguished which of the six parties to the Unicare Retrocession was specifically responsible for the failure to disclose, nor have they distinguished how these "facts" relate to each party. Moreover, Odyssey has failed to allege with specificity that employees of Web knew that Euro had failed to inform Odyssey of these "facts." *See, e.g., Department of Economic Development*, 747 F.Supp. at 938–39. To the extent that these "facts" are forecasts as to the profitability of insurance policies, which are by their nature subject to elements of risk, plaintiff has cited no authority for the proposition that a defendant may be held liable in fraud for a failure to disclose its prediction as to the profitability or unprofitability of an agreement,[19] let alone for the failure of someone else as well.

---

19. *See, e.g., Furman v. Sherwood*, 833 F.Supp. 408, 412 (S.D.N.Y.1993) (describing the diffi-

The "Clarendon/Hallmark Retrocesion" and "Web Variable Quota Share Retrocession" pleadings not only suffer from these same defects, but also fail to specify what Odyssey's losses are, if any, stemming from the transactions. *See Barr v. McGraw–Hill, Inc.,* 710 F.Supp. 95, 97 (S.D.N.Y.1989) ("To satisfy Rule 9(b), plaintiffs must plead [among other things] the losses suffered.").

### b. *Pleadings of Intent*

■ Odyssey has also insufficiently pled Web's fraudulent intent. *See Moore v. Painewebber, Inc.,* 189 F.3d 165, 172–73 (2d Cir.1999) (Although intent may be averred generally under Rule 9(b), plaintiff must allege facts that give rise to a "strong inference of fraudulent intent."); *Chill v. General Electric Co.,* 101 F.3d 263, 267 (2d Cir.1996) (same). A complaint may give rise to a sufficient inference of fraudulent intent in two ways, either: (1) by identifying circumstances indicating conscious behavior by the defendant through "correspondingly" strong allegations; or (2) by alleging a motive for committing fraud and a clear opportunity for doing so. *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995). Odyssey's Amended Complaint simply does not plead Web's involvement in the alleged conspiracy sufficiently to meet either standard.

■ The Second Circuit has stated that an inference of intent must entail allegations of "concrete benefits that could be realized by one or more of the ... nondisclosures alleged." *Chill,* 101 F.3d at 267–68. However the Court warned in *Chill,* that "[t]he motive to maintain the appearance of corporate profitability, or the success of an investments, will naturally involve benefit to a corporation, but does not 'entail concrete benefits.'" *Id.* See also *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) ("[i]f scienter could be pleaded on [the] basis [of a desire to increase compensation] alone, virtually every company in the United States" would face fraud liability.).

■ Here, even if one assumes Odyssey sufficiently pled the above mentioned "facts," plaintiff still has failed to plead that Web had any basis to believe that its failure to directly inform Odyssey of them would yield "concrete benefits." Odyssey has pled no facts from which one could conclude that Web was aware of what the Euro defendants did or did not disclose to Odyssey. And as the SCB defendants correctly point out, under British law, Odyssey enjoyed the right to inspect all of the relevant documents of the other defendants at any time. SCB Mem. at 16 (citing, *inter alia,* Evan Bennett, *Digging for Truth, Justice and ... Reinsurance Forensic Audits in Arbitration and Litigation,* 6 No. 12 Mealey's Litigation Reporter: Reinsurance 14 (October 25, 1994)). *Accord MacGillivray on Insurance Law* § 33–81. Even if Web was aware of the alleged fraud against Odyssey by its own agent Euro, there is still no basis to believe Odyssey would not have discerned the truth through its right to inspection. Since Odyssey has not pled that Web was assured of "concrete benefits" stemming from its individual nondisclosure, its claim of fraud against Web must fail.

Moreover, "[w]hen courts speak of 'clear opportunity' to commit fraud, they do not envision the kind of elaborate plot that is alleged to have unfolded in this case." *Powers,* 57 F.3d at 185. Plaintiff's Amended Complaint alleges only the barest of contacts between Web, in the United States, and the Euro defendants, on an entirely different continent, and none between Web and Odyssey. The number of inferences of collusion the finder of fact would need to draw to connect Web and Odyssey is well outside the realm of "clear opportunity." This Circuit requires more

culty in sufficiently pleading facts under Rule 9(b) that support an action in fraud for an

affirmatively stated prediction).

facts to support a claim of fraudulent intent.

### c. Web's Duty to Odyssey

█ Apart from plaintiff's failings as to specificity and intent, plaintiff's case also suffers from a failure to allege properly a duty on the part of Web to disclose that which was allegedly omitted. In case of fraud resting on an alleged omission, plaintiff must allege facts giving rise to a duty to disclose. *Aaron Ferer & Sons,* 731 F.2d at 123; *Armstrong v. McAlpin,* 699 F.2d 79, 90 (2d Cir.1983); *Canpartners Investments IV, L.L.C. v. Alliance Gaming Corp.,* 981 F.Supp. 820, 825 (S.D.N.Y. 1997). *See also Royal Business Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1064 (1st Cir.1991) ("[T]here can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose."). Although the existence of a duty to disclose is ultimately a matter of substantive law, plaintiff's Amended Complaint fails Rule 9(b) analysis here as well.

"Rule 9(b) is 'not satisfied by a complaint in which defendants are clumped together in vague allegations.'" *Ellison,* 36 F.Supp.2d at 640–41 (quoting *In re Blech Securities Litigation,* 928 F.Supp. 1279, 1294 (S.D.N.Y.1996); *Three Crown L.P. v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993)). *Cf. Royal Business Group,* 933 F.2d at 1064 (dismissing fraud case where "plaintiffs can identify no legal basis on which an affirmative duty to disclose might rest"); *Connolly v. Havens,* 763 F.Supp. 6, 10 (S.D.N.Y.1991) ("The allegation, without more, that [defendant was] 'responsible for compliance with securities laws and regulations' [in broker/customer relationship with plaintiff], without any allegation or legal authority that [defendant] owed any [fiduciary] duty to the plaintiffs, cannot create a fiduciary duty where none existed.").

█ Plaintiff argues that all sixteen defendants owed it a "a duty to disclose all material facts concerning the reinsurance transactions at issue in this case." Pl.

Mem. at 22. However, the case plaintiff cited for this proposition, *St. Paul Fire and Marine Insurance Co. v. Heath Fielding Insurance Broking, Ltd.* No. 91 Civ. 0748, 1993 WL 187778, at *5 (S.D.N.Y. May 25, 1993), does not so state and has never been cited for that proposition in any reported opinion. Moreover, Judge Lowe's opinion in *St. Paul* is entirely distinguishable from this present case. There, the duty involved was between the plaintiff company, its former employee and its representative under a binding authority agreement. While the case has relevance to the duty between Odyssey, the Euro defendants, and the Odyssey employee who signed the binding authority agreement on its behalf, it does not support the existence of a duty of Web to disclose on behalf of the third-party Euro defendants.

Plaintiff does not make any sufficient argument that a party to a reinsurance contract (Web) has a duty to independently inform a disclosed principal (Odyssey) anything beyond that which it has disclosed to the principal's agent (Euro). Indeed, this proposition has been rejected in other cases. *See China Union Lines, Ltd. v. American Marine Underwriters, Inc.,* 755 F.2d 26, 29 (2d Cir.1985) (finding "no merit" in plaintiff insurance company's argument that a reinsurer had a duty to disclose to it "the difference in premiums" at the time that the plaintiff's agent made a deal with the reinsurer on plaintiff's behalf); *Philan Insurance Ltd. v. Frank B. Hall & Co.,* 748 F.Supp. 190, 197 (S.D.N.Y.1990) ("A review of the case law makes it clear that, contrary to plaintiff's claim, there is no general rule that insurance intermediaries act in a fiduciary capacity to reinsurers . . . ."). The very crux of Odyssey's Amended Complaint is that its agents in Euro were well aware of the profitability or, more accurately, risk associated with the policies being ceded to Odyssey. *See, e.g.,* Comp. ¶ 72. The Amended Complaint simply does not set forth a sufficient basis to hold Web liable for fraud by omission.

■ Odyssey's argument that all parties to a reinsurance agreement owe one another an obligation "of utmost good faith" finds more support in case law. See, e.g. *Unigard Security,* 4 F.3d at 1066 (describing duty of "utmost good faith" implied in all reinsurance contracts). However, this duty does not extend as far as plaintiff takes it. The case plaintiff cites, *Sun Mutual Insurance Co. v. Ocean Insurance Co.,* 107 U.S. 485, 510, 1 S.Ct. 582, 27 L.Ed. 337 (1883), is 117 years old and does not address the duty owed between parties as far removed as Web and Odyssey, who had at least one and often two or three parties to the transaction between them.[20] *Sun Mutual,* like *St. Paul,* revolved around the duties implied into a contract between the parties *to that contract,* not between third and fourth parties. *See Philan Insurance,* 748 F.Supp. at 197 (finding no such general duty between insurance intermediaries and reinsurers). As such, plaintiff has not sufficiently alleged a duty to disclose on the part of Web that could be the basis of a fraud claim.

#### d. *Vicarious Liability for Statements of Euro*

In apparent recognition of the precariousness of its position, plaintiff has endeavored to use its conspiracy allegations to attribute to Web the allegedly fraudulent "Background Report," "Business Plan," and other statements and omissions for which Euro was responsible. Pl.Mem. at 20–21. "The Court must be especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants." *Lobatto,* 1999 WL 672994, at *9 (citing *Scone Investments, L.P. v. American Third Market Corp.,* No. 97 Civ. 3802, 1998 WL 205338, at *4 (S.D.N.Y. Apr.28, 1998)). "To this end, a complaint may not rely upon blanket inferences to the acts of all defendants without identifying each defendant's participation in the fraud." *Id. See also Mills v. Polar Molecular,* 12 F.3d 1170, 1175 (2d Cir.1993) (A pleading cannot satisfy Rule 9(b) by "vaguely attribut[ing] the alleged fraudulent statements to 'defendants.' "); *DiVittorio,* 822 F.2d at 1247 (reciting that where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud).

"The word 'conspiracy' does not alone satisfy the specificity requirement of Rule 9(b)." *Segal,* 467 F.2d at 608. "Mere general allegations that there was fraud, corruption or conspiracy, or acts or conduct in these terms are not enough [to make them more than conclusory] no matter how frequently repeated." *Id.* at 607 (citations omitted). *See also Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir. 1979) ("It will not do merely to . . . rely on such meaningless phrases as 'scheme and conspiracy.' ").

■ A proper allegation of a conspiracy to commit fraud in a civil complaint must set forth with certainty facts showing particularly: (1) what a defendant or defendants did to carry the conspiracy into effect; (2) whether such acts fit within the framework of the conspiracy alleged; and (3) whether such acts, in the ordinary course of events, would proximately cause injury to the plaintiff. *Ramos v. Patrician Equities Corp.,* 765 F.Supp. 1196, 1199 (S.D.N.Y.1991) (citing *Hoffman v. Halden,* 268 F.2d 280, 295 (9th Cir.1959); *Martin Hodas, East Coast Cinematics v. Lindsay,* 431 F.Supp. 637, 643–44 (S.D.N.Y.1977)).

In short, the complaint must "allege some factual basis for a finding of a conscious agreement among the defendants." *Hecht,* 897 F.2d at 26 n. 4.[21] *See also*

---

**20.** In addition, the extended discussion in *Unigard Security* makes it abundantly clear that the fiduciary ties between reinsurance entities have grown weaker over the years since *Sun Mutual.* 4 F.3d at 1054, 1064–66.

**21.** In *Hecht,* the Second Circuit found that pleadings of conspiracy, as distinguished from the underlying acts of fraud, are properly measured under the "more liberal pleading requirements of Rule 8(a)." *See* Fed.R.Civ.P.

*Moore,* 189 F.3d at 172–73; *Chill,* 101 F.3d at 267; *Ouaknine v. MacFarlane,* 897 F.2d 75, 79–80 (2d Cir.1990) ("To pass muster under Rule 9(b) . . . there must be some factual basis for conclusory allegations of intent . . . giving rise to a 'strong inference' of fraudulent intent."). *Cf. Kolbeck v. LIT America, Inc.,* 923 F.Supp. 557, 569–570 (S.D.N.Y.1996) (By alleging fraud through a theory of agency, "plaintiffs have assumed responsibility not only to plead the underlying fraud, but also the fraudulent agency, with Rule 9(b) particularity.").

Even in the light most favorable to plaintiff, the Amended Complaint provides only the following alleged facts to support its oft-repeated claim that Web was party to defendants' conspiracy:

(1) Web is partially owned by SCB Holdings (Comp. ¶ 16);

(2) One of Web's principal, Bastan, was formerly employed with Billyard and "transacted substantial business" with the other defendants (*id.* ¶ 24);

(3) Web's other principals, Ekwall and Wright, were employed by Phoenix Home Life and Phoenix American Life in other transactions involving SCB entities (*id.* ¶¶ 23–24);

(4) Since its formation, Web's "retrocessional protection has been provided almost exclusively through companies controlled by the enterprise" (*id.*);

(5) Web, among other defendants was "poised" to "accept knowingly underpriced U.S. worker's compensation risks" (*id.* ¶ 25);

(6) Web derived "substantial fees" for " 'underwriting' insurance and reinsurance" (*id.* ¶ 27(a));

(7) Web served as underwriter for All American Life Insurance Company in a 1998 transaction by which Euro accepted on behalf of Odyssey liability for a policy All American had previously reinsured for the California company Unicare (the "Unicare Retrocession," *id.* ¶ 69);

(8) Web served as underwriter for Trustmark Insurance Company in an incoherently described 1998 transaction in which a company named as "Reliastar" accepted "three Lloyd's of London Syndicates" which were eventually ceded to Odyssey (the "Clarendon/Hallmark Retrocession," *id.* ¶¶ 70–72);

(9) In another 1998 transaction, risks "accepted originally by Web," were later ceded to Odyssey through two of the SCB defendants, the JEH defendants, the previously dismissed defendant Centaur Underwriting Management (Bermuda) Limited, and Euro (the "Web Variable Quota Share Retrocession," *id.* ¶ 73);

(10) Web and Ekwall sent two faxes to Jeff Butler of SCB Reinsurance Brokers (*id.* ¶¶ 92(z), 92(bb)); and

(11) Web sent a fax to Unicare describing the Unicare Retrocession (*id.* ¶ 92(aa)).

■ Taken together, these facts can only lead to the inference that Web and its principals successfully did business with their long-time business contacts, not the kind of "conscious behavior" that courts have required. *See Powers,* 57 F.3d at 185 (Intent may be found through conscious behavior when a defendant violates an agreement "maliciously."). Plaintiff must allege more than that defendants had worked together previously to create an inference of the fraudulent intent to enter into a conspiracy against this particular plaintiff. *See Gerstenfeld v. Nitsberg,* 190

---

8(a). However, in a case such as this, where the Court must evaluate whether the complaint provides facts sufficient for a finding that Web intended to enter a conspiracy to defraud Odyssey, we must also be mindful of this Circuit's requirements for pleadings of fraudulent intent. *See Acito,* 47 F.3d at 52

("[W]e must not mistake the relaxation of 9(b)'s specificity requirement regarding condition of the mind for a 'license to base claims of fraud on speculation and conclusory allegations.' ") (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)).

F.R.D. 127, 131–32 (S.D.N.Y.1999) (finding no inference of fraud where plaintiff "points to no circumstances that show [defendant] consciously set out to defraud him").

Plaintiff also cannot meet the alternative requirement of showing motive and a clear opportunity. Odyssey must plead more than that a corporate defendant sought to profit from an arrangement in order to give rise to an inference of fraudulent motive. *See Grossman v. Texas Commerce Bancshares, Inc.,* No. 87 Civ. 6295, 1995 WL 552744, at *10 (S.D.N.Y. Sept.15, 1995) ("Plaintiff's allegations of motive [of economic self-interest] are of the generalized, commonplace nature that the courts within this circuit have found to provide an insufficient basis of scienter.").

The required strong inference of "clear opportunity" is lacking here. Again, plaintiff has not alleged any direct connection between Web and the allegedly fraudulent representations that caused Odyssey to extend the Euro defendants the binding authority. *See NCA Holding Corp. v. Ernestus,* No. 97 Civ. 1372, 1998 WL 229510, at *3 (S.D.N.Y. May 7, 1998) ("As plaintiffs have not pleaded facts connecting [the American defendant] to any of the transactions involving his [foreign] co-defendants in which false representations have been alleged, plaintiffs' fraud claim against [the American defendant] is also dismissed."). Nowhere does plaintiff provide facts giving rise to a strong inference that Web knew what the Euro defendants did or did not represent to Odyssey, an ocean away. *See Ackerman v. National Property Analysts, Inc.,* 887 F.Supp. 494, 505 (S.D.N.Y.1992) (To plead fraud conspiracy properly, plaintiff must set forth "allegations which demonstrate that each defendant knew or had reason to know of the false statements and material omissions" conveyed to the plaintiff.) (citing *DiVittorio,* 822 F.2d at 1247;

*Luce v. Edelstein,* 802 F.2d 49, 55–57 (2d Cir.1986)).

Even under the theory that Web was one of the spokes ·to the conspiratorial wheel, plaintiff has not alleged enough facts to infer that Web had "sufficient awareness of the existence of other members of the alleged conspiracy to render them part of the 'rim of the wheel to enclose the: spokes.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. 91 Civ. 2923, 1994 WL 88129, at *31 (S.D.N.Y. Mar.15, 1994) (dismissing conspiracy charge where allegations of conspiracy were merely conclusory and "impermissibly "collectivize[d] the defendants") (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Zabare,* 871 F.2d 282, 287–88 (2d Cir.1989)). The facts pled against Web do not create a "strong inference of fraudulent intent." As such, they are insufficient to attribute conspiratorial liability to Web for the statements of the Euro defendants.

Odyssey cites *Dimon, Inc. v. Folium, Inc.,* 48 F.Supp.2d 359, 364 (S.D.N.Y.1999), in support of its claim that Web should be held liable for the statements of the other defendants. However, the portion of the case cited addresses personal jurisdiction, not fraud. More importantly, in *Dimon,* Judge Kaplan dismissed a common law fraud claim against one defendant because plaintiff "advanced no basis for holding [the dismissed defendant] responsible for the alleged fraud or negligent misrepresentation with respect to [another party]." *Id.* at 367. Inasmuch as Judge Kaplan's decision and the other decision cited by plaintiff, *Ghazoul v. International Management Services, Inc.,* do support the proposition that the "allegations of conspiracy are permitted to connect the actions of separate defendants in an action for fraud," [22] they do so under New York

---

**22.** *See* Pl.Mem. at 20–21; *Dimon,* 48 F.Supp.2d at 374; *Ghazoul,* 398 F.Supp. 307,

312 (S.D.N.Y.1975).

substantive law, not the law of Britain that governs plaintiff's fraud action, and do not eliminate the Amended Complaint's deficiencies described above.

### 2. RICO—Direct Liability

The crux of plaintiff's claim, of course, is brought under RICO and it treble damage provision. 18 U.S.C. §§ 1961 et. seq. RICO authorizes a private cause of action for "[a]ny person injured in his business or property by reason of a violation of Section 1962." 18 U.S.C. § 1964(c). To state a claim for damages based upon a violation of § 1962, plaintiff must allege the following elements: (1) that the defendants, (2) through the commission of two or more predicate acts, (3) constituting a "pattern" (4) of "racketeering activity," (5) directly or indirectly invest in or maintain some interest in, or participates in (6) "an enterprise,"[23] (7) the activities of which affect interstate or foreign commerce. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir.1983).

■ Specifically, plaintiff alleges that Web has committed violations of 18 U.S.C. § 1962(c). Section 1962(c) makes it unlawful to participate in the conduct of an enterprise through "a pattern of racketeering activity" in interstate or foreign commerce.[24] In defining "a pattern of racketeering activity," the RICO statute requires at least two predicate acts that occurred within ten years of each other.

**23.** An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.1961(4).

**24.** Section 1962(c) provides in full: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

**25.** Plaintiff maintains that its RICO claim "also include[s] allegations of banking and stolen property fraud." Pl.Mem. at 12, (citing Comp. ¶¶ 90–94). However, even the most

18 U.S.C. § 1961(5). However, while the showing of two acts is necessary, without more it is not sufficient to establish a pattern. In H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court explained that, in order to show a pattern, a plaintiff must show both relationship and continuity among the predicate acts.

Here, plaintiff's complaint not only suffers from its inability to plead the requisite predicate offenses, but it also has failed to allege facts which could show that plaintiff suffered "injury ... by reason of [Web's alleged] violation."

### a. Mail and Wire Fraud

■ Plaintiff's RICO claim is grounded in alleged predicate acts of mail and wire fraud.[25] 18 U.S.C. §§ 1341, 1343. Because [the mail and wire fraud statutes] are broader than common law fraud, it is possible for a plaintiff to have sufficiently pled mail or wire fraud while having failed nevertheless to plead common law fraud. In re Sumitomo Copper Litigation, 995 F.Supp. 451, 455 (S.D.N.Y.1998) (quoting Ray Larsen Associates, Inc. v. Nikko America, Inc., No. 89 Civ. 2809, 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996)). Because of this dichotomy, we briefly address the elements of plaintiff's mail and wire fraud claims.

thorough and generous reading of the cited paragraphs of the Amended Complaint does not reveal a level a specificity of pleading vis à vis banking and stolen property fraud any greater than that for mail and wire fraud. To the contrary, the only alleged fact related to banking fraud is that premiums paid "must have flowed through the United States banking system." This conclusory, de minimus allegation is insufficient to meet the pleading requirements of Rule 9(b). See, e.g., Reisner v. Stoller, 51 F.Supp.2d 430, 452 (S.D.N.Y. 1999) (rejecting bank fraud element of RICO claim for failure to give approximate dates of payments to bank). As such, plaintiff's claim must stand or fall on the strength of its mail and wire fraud allegations.

A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme. *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996). At the same time, any alleged predicate acts involving fraud must be pled with the same specificity required by Rule 9(b). *Moore,* 189 F.3d at 172–73; *Mills,* 12 F.3d at 1176. Here, plaintiff's claim against Web fails because of the insufficiency of its pleadings against Web related to both the second and third elements of mail and wire fraud.

First, the Amended Complaint is barren of facts that could support an inference that Web used either mail or wire "in furtherance of the scheme." Where a complaint does not delineate specifics regarding the defendant's use of mail or wire, there can be no predicate act of mail or wire fraud. *Bernstein v. Misk,* 948 F.Supp. 228, 239 (S.D.N.Y.1997) (citing *McCoy v. Goldberg,* 748 F.Supp. 146, 154 (S.D.N.Y.1990)). *See also Qantel Corp. v. Niemuller,* 771 F.Supp. 1361, 1369 (S.D.N.Y.1991) (requiring plaintiffs to identify number of telephone calls made and dates on which they were made to plead wire fraud with particularity).

Although material omissions may violate the mail and wire fraud statutes (*see United States v. Mittelstaedt,* 31 F.3d 1208, 1217 (2d Cir.1994); *United States v. Federal Record Service Corp.,* No. 99 Civ. 3290, 1999 WL 335826, at *17 (S.D.N.Y. May 24, 1999)), plaintiffs must "identify the purpose of the mailing within the defendant's fraudulent scheme." *Moore,* 189 F.3d at 173 (quoting *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992)); *Lorentzen v. Curtis,* 18 F.Supp.2d 322, 330

(S.D.N.Y.1998). "[A]llegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Mills,* 12 F.3d at 1176. And while the use of the mail or wire need not be an essential element of the alleged fraud, it must at least be "incidental to an essential part" of the underlying fraudulent scheme. *Schmuck v. United States,* 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *DiFiore v. DiLorenzo,* No. 91 Civ. 4209, 1997 WL 722697, at *4 (E.D.N.Y. Sept.19, 1997).

Here, as in *Bernstein,* 948 F.Supp. at 239, plaintiff's mail and wire fraud claims are insufficient because there are no facts in the body of the complaint that refer to use of the mail or telephone in connection with the fraudulent scheme. In fact, the Amended Complaint does not allege even a single specific use of the mails by Web. As for wire fraud, the Amended Complaint does allege that Web and its principals sent three faxes in mid to late 1998.[26] However, the Amended Complaint, which describes the faxes only by sender, recipient, date, and a general three-word description does not begin to "identify the purpose of the mailing within the defendant's fraudulent scheme." *See, e.g., Moore,* 189 F.3d at 173; *Lorentzen,* 18 F.Supp.2d at 330. Odyssey has not pled facts that can lead to any inference as to what the contents were, where they took place, why they were fraudulent, *Mills,* 12 F.3d at 1176, or even why they were "incidental to an essential part" of the fraud. *See Schmuck,* 489 U.S. at 712, 109 S.Ct. 1443; *DiFiore,* 1997 WL 722697, at *4.

Second, for the reasons discussed, *supra,* plaintiff has failed to plead Web's "knowing or intentional participation in the

---

26. The three alleged facsimiles are: (1) one "dated April 14, 1998 to Unicare from Web regarding the Unicare Retrocession" (Comp. ¶92(bb)); (2) one "dated May 6, 1998, to Jeff Butler, SCB Insurance Brokers, from Bastan, Web, regarding the Unicare Retrocession" (*id.* ¶92(aa)); and (3) one "dated December 17, 1998 to Peter Cleary and Jeff Butler, SCB Reinsurance Brokers, from Rubin Ekwall [of Web] attaching letter of Credit Worksheet, dated December 3, 1998" (*id.* ¶92(z)).

scheme." If anything, the specific intent requirement for mail or wire fraud is higher than that discussed above in the context of plaintiff's common law fraud claim. *See, e.g., Powers,* 57 F.3d at 184 (since mail fraud may be completed without proof that anyone was actually defrauded, plaintiff must adequately allege intent to defraud); *United States v. Frank,* 156 F.3d 332, 336–37 (2d Cir.1998) ("[I]t was error for the district court to instruct the jury that it could find an intent to defraud based solely on the applicants desire to gain a benefit for themselves."); *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994) (finding that mail fraud "cannot be charged against a corporate agent who in good faith believes that his or her (otherwise legal) misleading or inaccurate conduct is in the corporation's best interests").

Additionally, for the reasons described above, Odyssey has failed to plead facts sufficient to support a duty to disclose on behalf of Web. An omission cannot give rise to a claim of mail or wire fraud liability absent a duty to disclose. *Mittelstaedt,* 31 F.3d at 1217; *United States v. Autuori,* No. 3:96 Cr. 161, 1998 WL 774232, at *23 (D.Conn. Aug.28, 1998).

It is true that a RICO complaint need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pled so as to give notice to each of the defendants where, as here, the sufficiency challenge precedes discovery. *See, e.g., Ifill v. West,* No. 96 Civ. 6308, 1999 WL 690144, at *4 (S.D.N.Y. Aug.24, 1999). However, such a relaxation ·is not merited here, where the pleadings as to the overall scheme suffer from the multiple deficiencies described above and below as applied to Web. *See, e.g., First Interregional Advisors Corp. v. Wolff,* 956 F.Supp. 480, 485 (S.D.N.Y.1997) (dismissing RICO case against certain defendants where plaintiff "failed to sufficiently allege that [they] participated in any acts of mail or wire fraud").

### c. *RICO Causation and Wire Fraud*

██ The Supreme Court has interpreted RICO's "injured ... by reason of" language in § 1964(c) to require a showing of "proximate causation" in all RICO cases. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). "This causation requirement, which is jurisdictionally mandated has two different components." *Moore,* 189 F.3d at 169. "There must be 'transaction causation,' meaning that the [omission] must have led the plaintiffs to enter into the transactions at issue, and there must be 'loss causation,' meaning that the [omission] must be both actual and a proximate source of the loss that the plaintiffs suffered." *Id.* Odyssey fails on both counts.

██ To show transaction causation, the plaintiff must demonstrate that but for the defendant's wrongful acts, the plaintiff would not have entered into the transactions that resulted in their losses. *Id.* at 172. In other words, plaintiff must show that it relied on defendant's omission. *Lorentzen,* 18 F.Supp.2d at 327; *DiFiore,* 1997 WL 722697, at *6 (both citing *Metromedia Co. v. Fugazy,* 983 F.2d 350, 368 (2d Cir.1992)). Here, Odyssey extended the allegedly fraudulently-procured binding authority on January 27, 1997. Yet the earliest factual allegation related to Web is the "Christmas Eve Placements," which took place nearly eleven months later. The remaining three allegedly fraudulent transactions, as well as all three alleged uses of international wires, occurred well after Odyssey extended the binding authority on February 11, 1998. Whatever role Web may have had in the activities of the Euro defendants, it apparently took place well after the allegedly fraudulent scheme had been consummated. Because, as discussed earlier, Web did not have a duty to disclose the "facts" of these transactions directly to Odyssey, there can be no claim that Odyssey "relied" on Web's silence. *See, e.g., Feeley v. Whitman Corp.,* 65 F.Supp.2d 164, 174–75 (S.D.N.Y.

1999) (finding no reliance for RICO liability where plaintiff could not have relied on defendant).

■ To show loss causation, the plaintiff must show that the defendant's omissions were the "the reason the transaction[s] turned out to be ... losing one[s]." *Moore*, 189 F.3d at 172. Where the loss is the result of intervening direct causes, there can be no proximate causation. *See Powers*, 57 F.3d at 189–90; *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994) ("[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions."). Here, the proximate cause of the losses pled by Odyssey was the alleged failure to disclose by Odyssey's agents, the Euro defendants, not Web. *See Department of Economic Development*, 747 F.Supp. at 941 ("Assuming arguendo that [one defendant's] failure to disclose [a] fraudulent scheme caused [plaintiff] injury, any harm to [the plaintiff] stemmed from the alleged nondisclosure by [those with a duty to disclose it to the plaintiff] rather than from [the first defendant's] predicate acts themselves.").

### 3. *RICO—Conspiracy Liability*

■ Again, plaintiff attempts to overcome the problems in its direct case against Web by relying on allegations of conspiracy, specifically under RICO's statutory provision, 18 U.S.C. § 1962(d). Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions subsection (a), (b), or (c) of this section." To state a claim under § 1962(d), a plaintiff must plead as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same. *Hecht*, 897 F.2d at 25; *First Interregional Advisors*, 956 F.Supp. at 488.

■ Second Circuit case law has made it clear that it is not enough to allege that a defendant agreed to the commission of two or more predicate acts by any co-conspirator; the plaintiff must allege that each defendant agreed to personally commit at least two predicate acts. *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1344–45 (2d Cir.1994); *Hecht*, 897 F.2d at 25; *Merrill Lynch*, 1994 WL 88129, at *30–31. Where a RICO conspiracy claim is based on predicate acts that have been dismissed by the court, the conspiracy claim "must be dismissed as well." *Medgar Evers Houses*, 25 F.Supp.2d at 124 (citing *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996)).

■ Since we have previously dismissed plaintiff's claim against Web for the underlying predicate acts of mail and wire fraud, plaintiff's RICO conspiracy count must be similarly dismissed. *See id. See also Naso v. Park*, 850 F.Supp. 264, 275 (S.D.N.Y.1994) (finding that where plaintiff failed to plead any intent to commit predicate acts, they could not have pled a conspiracy to commit predicate acts). As we discussed above in the context of Odyssey's pleadings of Web's intent, plaintiff has failed to allege facts that could lead to the conclusion that Web agreed either to join the conspiracy or to commit the two predicate acts. *See, e.g., Casio Computer Co. v. Sayo*, 98 Civ. 3772, 1999 U.S.Dist. Lexis 14675, at *72–73 (S.D.N.Y. Sept. 20, 1999) (granting motion to dismiss where amended complaint "does not make specific factual allegations required for the Court to conclude that defendants consciously agreed to become part of a RICO conspiracy and commit the necessary predicate acts of racketeering"); *American Buying Insurance Services, Inc. v. S. Kornreich & Sons, Inc.*, 944 F.Supp. 240, 247–48 (S.D.N.Y.1996) (granting motion to dismiss § 1962(d) claim where complaint "specifically alleges no actions by any of the individual corporations either in defrauding plaintiffs or in participating in or approving any of the

predicate acts"); *Merrill Lynch,* 1994 WL 88129, at *30 ("[N]umerous district courts within this circuit have dismissed conclusory allegations of agreement as insufficient to state a RICO conspiracy claim.") (citations omitted); *Com–Tech Associates v. Computer Associates International, Inc.,* 753 F.Supp. 1078, 1092 (E.D.N.Y.1990) (dismissing conspiracy count because plaintiff failed to allege facts establishing that each of the defendants, by words or actions, manifested an agreement to commit two or more predicate acts). As such, plaintiffs claims against Web are properly dismissed.[27]

### B. *Forum Non Conveniens*

The Euro and SCB defendants move to dismiss this case based on the doctrine of *forum non conveniens,* contending that England is the more appropriate forum for the resolution of this dispute. The doctrine of *forum non conveniens* "leaves much to the discretion of the court to which plaintiff resorts." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *See also Capital Currency Exchange, N.V. v. National Westminster Bank, P.L.C.,* 155 F.3d 603, 609 (2d Cir.1998) ("[T]he decision lies wholly within the broad discretion of the district court....") (quoting *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996)).

■ Although a plaintiff's choice of forum warrants strong deference, such deference is weakened when the plaintiff is itself foreign. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Capital Currency Exchange,* 155 F.3d at 609, 612 ("Because the real parties in interest are foreign corpora-

tions, there is not a strong presumption in favor of plaintiffs' choice of forum."); *PT United,* 1997 WL 31194, at *7.

■ There are two steps to resolving a *forum non conveniens* motion. *Peregrine Myanmar,* 89 F.3d at 46. First, the court must determine whether an alternative forum is available and adequate. *See id.; Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993). Second, if an adequate forum is available, the court must then consider the relevant "private" and "public" interest factors and determine whether "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167–68 (2d Cir.1991) (citing *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839).

#### 1. *Available and Adequate Alternative Forum*

■ The determination of whether an alternative forum is available and adequate involves two concerns. *Capital Currency Exchange,* 155 F.3d at 609. First, we must determine whether the proposed forum is "adequate" in that it permits "litigation of the subject matter of the dispute." *Id.* (quoting *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. 252). Here, there can be no serious objection to the proposition that British courts provide an adequate substitute for fraud-based RICO claims. *PT United,* 138 F.3d at 74; *Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129–30 (2d Cir.1987). Second, we must be satisfied that the proposed forum is "available" in that defendants are sub-

---

**27.** Plaintiff has understandably not sought leave to replead its amended complaint in the event of a dismissal. Leave to amend is appropriately denied where, as here, the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies. *Chill,* 101 F.3d at 271–72; *McLaughlin,* 962 F.2d at 195; *In re Hyperion Securities Litigation,* No. 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. Jul.14, 1995) (denying leave to amend where plaintiffs had

been given "more than two bites at an apple they have not been able to get their teeth into") *aff'd* 98 F.3d 2 (2d Cir.1996). In addition, we do not believe, given the above discussion of the duty to disclose, that plaintiff could ever replead such a duty. *See Chill,* 101 F.3d at 271–72; *Philan Insurance,* 748 F.Supp. at 198 (finding that plaintiff's failure to improve the complaint "is explicable only on the ground that plaintiffs possess no facts to support their conclusory allegations").

ject to service of process there. *Capital Currency Exchange,* 155 F.3d at 609.

■ Plaintiffs argue that England would not be an available forum as against all defendants since "a complete resolution of this matter could not be achieved in England" which "militates against dismissal in favor of a foreign forum." Pl.Mem. at 42. Indeed, plaintiff may even understate Second Circuit case law, which could be read to require that all defendants be amenable to process in an alternate forum before the doctrine of *forum non conveniens* may even be invoked. *Madanes v. Madanes,* 981 F.Supp. 241, 265–66 (S.D.N.Y.1997) (finding that the requirement that defendants be amenable to process in the alternate forum "refers to all defendants, not just the 'primary' ones") (citing *Watson v. Merrell Dow Pharmaceuticals, Inc.,* 769 F.2d 354, 357 (6th Cir. 1985)). *See also Jota v. Texaco, Inc.,* 157 F.3d 153, 158–59 (2d Cir.1998); *PT United,* 138 F.3d at 74 (finding that in order to grant dismissal for *forum non conveniens,* court must satisfy itself that litigation may be conducted elsewhere against all defendants).[28]

The majority of the defendants in this case, though, are British subjects, who are naturally amenable to suit in the U.K. The rest are either subject to British jurisdiction, have already extended consent to jurisdiction there, or have now been dismissed.[29] *See PT United,* 138 F.3d at 74 (finding that "any potential problem" with a *forum non conveniens* dismissal "was cured [because] after the individual defendants are dismissed, they are no longer

parties before the court [and] any [remaining] potential jurisdictional problem is avoided" by conditioning dismissal on consent to the alternate jurisdiction).

Apart from Web, the only defendants to refuse to consent to jurisdiction in the U.K. were the JEH defendants (residents of Bermuda). In oral argument before this Court (Kaplan, J.), counsel for the JEH defendants pointedly refused to consent to personal jurisdiction in London. Tr. at 9. In fact, JEH has taken the position in a letter to Judge Kaplan, dated July 6, 1999, that it will not "consent to the jurisdiction of any domestic court of general jurisdiction."

Nonetheless, given that both JEH and Billyard are residents of Bermuda, a British Dependant Territory, their consent is not required in order for a British court to assert the equivalent of personal jurisdiction over them. In an *amicus* brief in support of a Writ of Certiorari to the United States Supreme Court, the British Government took the position that "British Dependant Territories are at all times under the full sovereignty of the United Kingdom" and that "corporations of the British Dependant Territories are 'subjects' of the United Kingdom sovereignty." Brief of the Government of the United Kingdom and Northern Ireland as Amicus Curiae in Support of Petitioner, *Matimak Trading Co. v. Khalily,* 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998) (No. 97–893). Importantly, the British government concluded that any subject of the British Dependant Territories, including corpora-

---

**28.** These cases, though, do not address a situation such as in the instant case, where neither forum is likely to have jurisdiction over all named defendants since Web contests personal jurisdiction in England and seven of the defendants vigorously contest it in the United States. The doctrine of *forum non conveniens* "presupposes at least two forums in which the defendant is amenable to process." *Jota* 157 F.3d at 158–59 (quoting *Gulf Oil,* 330 U.S. at 506–07, 67 S.Ct. 839). *See also Flynn v. General Motors, Inc.,* 141 F.R.D. 5, 8 (S.D.N.Y.1992) ("In order for alternative forums to exist, both forums must have jurisdic-

tion over the ... parties in the suit.") (citing *Pain v. United Technologies Corp.,* 637 F.2d 775, 783 (D.C.Cir.1980)).

**29.** Even if SCB's American subsidiaries are not already amenable to process under British law, they have expressly consented to British jurisdiction. SCB Mem. at 30, n. 26 (citing Tr. at 9). Since we have already dismissed the claim against Web, it also presents no obstacle to a *forum non conveniens* dismissal.

tions incorporated in those territories, "has the capacity to sue and be sued in British courts." *Id.* (citing 2 Albert Venn Dicey John Humphrey Morris, *Conflict of Laws* 1107 (12th ed.1993)).[30] *See also* Fed. R.Civ.P. 44.1 ("The court, in determining foreign law, may consider any relevant material or source ... whether or not submitted by a party or admissible under the Federal Rules of Evidence."). As such, JEH defendants' refusal to consent to jurisdiction is unavailing.

### 2. *Public Interest Factors*

■ The public (and private) interest factors a court must consider in evaluating a *forum non conveniens* motion were set forth by the Supreme Court in *Gulf Oil* and *Piper Aircraft.* Among the public factors to be considered are: (1) the "local interest in having localized controversies decided at home;" (2) the interest in avoiding the unfair imposition of jury duty on citizens of an unrelated forum; (3) the interest in avoiding unnecessary problems with the conflict of law or the application of foreign law; and (4) the interest in avoiding administrative difficulties arising from court congestion. *Piper Aircraft,* 454 U.S. at 258 n. 6, 102 S.Ct. 252; *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839. In this case, we find that the public interest factors weigh strongly in favor of dismissal.

■ The gravamen of plaintiff's case is its charge that the English Euro defendants made material misrepresentations in order to secure Odyssey's binding authority and then committed further fraud by failing to disclose material facts in the face of a duty to do so. These events and omissions all took place in England. "New York has no interest in this case given that none of the parties is domiciled in New York, no business related to this case has been shown to have been transacted in New York, and none of the events giving rise to these causes of action occurred in New York." *PT United,* 1997 WL 31194, at *9. *See also Republic of Panama v. BCCI Holdings (Luxembourg), S.A.,* 119 F.3d 935, 952 (11th Cir.1997) (affirming *forum non conveniens* dismissal where the "vast majority of the fraudulent acts committed in furtherance of this scheme were committed abroad"). As a result, both the "local interest in having localized controversies decided at home" and the interest in avoiding the unfair imposition of jury duty on citizens of an unrelated forum weigh heavily against the Southern District of New York as the most convenient forum.

The fact that there may be ties between the British defendants and their partners in the American insurance industry does not in and of itself support an American interest in this case. *See Calgarth Investments Ltd. v. Bank Saderat Iran,* No. 95 Civ. 5332, 1996 WL 204470, at *6 (S.D.N.Y. Apr.26, 1996) ("[D]ebits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign.") *aff'd* 108 F.3d 329 (2d Cir.1997.); *Kilvert v. Tambrands, Inc.,* 906 F.Supp. 790, 794–95 (S.D.N.Y.1995). ("[W]ithout evidence of corporate dominance sufficient to infer control by [U.S.] defendant over the acts of its subsidiary in

---

**30.** The British Government took this same position just a few months ago in an *amicus* brief before this Court. *See III Finance Ltd. v. Aegis Consumer Funding Group, Inc.,* No. 99 Civ. 2579, 1999 WL 1080371, at *2 (S.D.N.Y. Nov. 30, 1999) (Chin, J.) (citing the brief as arguing that "corporations incorporated under the laws of one of [the United Kingdom's] Overseas Territories 'should [be] regarded as British companies' "). *See also, Klein v. Marriott International, Inc.,* 34 F.Supp.2d 176, 179 (S.D.N.Y.1999) ("Bermu-

da is a Dependant Territory of the United Kingdom which is not regarded as an independent sovereign nation or foreign state by the U.S. Department of State."). Although *Matimak* and *III Finance Ltd.* dealt with the issue of whether corporations of British Dependant Territories are British citizens for purposes of U.S. diversity jurisdiction, the United Kingdom's position is still illustrative of the fact that the JEH defendants are amenable to process under its law.

England, we conclude that the majority of [British] plaintiffs' claims do not directly involve the United States and that, consequently, England has the stronger nexus to this action."). If anything, the alleged ties between the chief alleged tort-feasor in *Kilvert* and its American parent company were stronger than the ties in the present case between reinsurance companies in England and primary insurance companies in the United States.

Plaintiff insists that the defendants' activities were designed to "manipulate the United States worker's compensation market" (Comp.¶1), but this allegation does not, in and of itself, create an interest in this forum where there is no one here claiming any injury. *Cf.* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.2 (1994) ("[T]he core of Article III's requirement for cases and controversies is found in the rule that standing is limited to those who allege that they have personally suffered or imminently will suffer injury.") (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

Plaintiff's argument bears strong similarities to the one rejected by the Second Circuit in *Capital Currency Exchange,* 155 F.3d at 612. There, the Court of Appeals criticized the argument that the United States provided a proper forum for a suit between British banks because they had transacted to transmit money through New York. The Court wrote that plaintiffs "have attempted to morphose this case into a dispute that concerns the United States by discussing [a] letter of credit issued ... in New York," but concluded that it was "clear at bottom" that the case was "a suit about two English banks' refusal to do business in England with [the plaintiffs]." *Id.* Similarly, the underlying policies issued in the United States do not make this an American case where, at bottom, this is an allegation of fraud committed by English defendants against an English plaintiff in England.

The interest in having forums interpret their own laws also weighs in favor of England serving as the forum. As explained earlier, British law would govern the application of the fraud claims that undergird this action. In contrast, the weight of any potential application of American law has been resolved above by the dismissal of Web as a defendant. Where the alleged harm perpetrated falls in a foreign jurisdiction, and as a consequence foreign law controls the outcome of the case, the foreign jurisdiction is the more convenient forum. *See PT United,* 1997 WL 31194, at *9–10.

The final public interest, that of avoiding court congestion, does not favor either side because "there is no indication that British courts are more or less congested than American courts." *Capital Currency Exchange,* 155 F.3d at 611.

### 3. *Private Interest Factors*

 The private interest factors include: (1) ease of access to proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining those witnesses; and (4) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Piper Aircraft,* 454 U.S. at 258 n. 6, 102 S.Ct. 252; *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839; *R. Maganlal,* 942 F.2d at 168. Again, we find that these factors weigh heavily in favor of dismissal.

Since the contacts between the Euro defendants and Odyssey took place in London, presumably most, if not all, witnesses to and documentary evidence of these events are located in England.[31] Any employees of Odyssey, Euro, or SCB London's offices whom any party might want to call are located in England, along with three of the four individual defendants:

---

**31.** According to the SCB defendants, "[v]irtually all of the documents are located with Odyssey, Euro, Whitcombe, Henton or [SCB]'s London Offices". SCB Mem. at 33 (citing April 27, 1999 Brown Decl. ¶ 7).

Whitcombe, Henton, and Brown. For this reason, the questions of ease of access to proof and cost of securing witnesses tip clearly in favor of dismissal. *See Capital Currency Exchange*, 155 F.3d at 611 (affirming *forum non conveniens* dismissal where "most of the witnesses in this case reside in England, and the cost of transporting these witnesses to New York could be enormous" and "most of the documentary evidence was created, and is stored, in England").

Plaintiff maintains that "this argument improperly ignores the events that took place and the evidence required from conduct that took place in Bermuda." Pl. Mem. at 45. However, this statement does nothing to refute the relative inconvenience of New York as opposed to England. *See Lan Associates XVIII, L.P. v. Bank of Nova Scotia*, No. 96 Civ. 1022, 1997 WL 458753, at *5 (S.D.N.Y. Aug.11, 1997) (refusing to find the Southern District of New York a more convenient forum than Turks & Caicos for evidence and witnesses located in Haiti and Canada).

More importantly, this Court's direct process could not compel the attendance of non-party witnesses located in England nor could it secure the production of documents in the control of non-party witnesses there. *See, e.g., Capital Currency Exchange*, 155 F.3d at 611–12; *PT United*, 1997 WL 31194, at *8. The SCB defendants have identified two "critical" non-party witnesses located in England: Vic Broad, the in-house underwriter for Odyssey's predecessor; and Horace Holman, Odyssey's agent through whom Whitcombe contacted Odyssey. SCB Mem. at 33. In stark contrast, Odyssey has identified no critical non-party witnesses in the United States.

▮ Moreover, since we have elected not to decide defendants' personal jurisdiction motions here, there is no guarantee that, were the case to remain in this District, all of the currently named defendants would remain parties to this action since seven of them contest this court's jurisdiction. *See Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 966 (2d Cir.1980) ("If the district court [has] no jurisdiction over [key defendants], New York clearly [is] an inconvenient forum, since only [some] of the defendants could [be] sued here."); *Kilvert*, 906 F.Supp. at 795–96 (S.D.N.Y.1995) (A defendant's inability to implead other parties directly involved in the controversy constitutes "clear prejudice" and "is a factor that weighs against the retention of jurisdiction in the Southern District of New York.") (citing *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir.1975)).

Even if we were to accept plaintiff's general proposition that "there are many witnesses and documents in the United States [related to] the reinsurance contracts that ... defendants improperly purportedly bound into Odyssey" (Pl.Mem. at 45), the contracts themselves and all surrounding documents would be subject to discovery in Britain under Odyssey's right of inspection. *MacGillivray on Insurance Law* § 33–81. *See also PT United*, 1997 WL 31194, at *8 ("Regardless of where this litigation commences, the parties will have access to documents located in the United States [and] a court in either forum hearing this case could compel the production of both party witnesses and those documents in the control of those parties."). Any additional parol evidence of these contracts in the United States is far less significant that what parts were or were not disclosed to Odyssey in England.

The court could determine no factor that weighs in favor of keeping the case in this district. This is so because, at its very heart, this is a case between British companies. Accordingly, it most conveniently be tried in Britain.[32]

---

32. Even had we not disposed of the claim against Web above, these concerns would still weigh strongly in favor of dismissing most of the case to Britain. "The *forum non conveniens* doctrine is valued for its flexibility and close attention to the specific facts of each

## C. Conclusion

For the reasons described above, Web's motion to dismiss Odyssey's claim against Web is granted unconditionally. In addition, the motion of the SCB defendants and the Euro defendants to dismiss this action on the ground of *forum non conveniens* is granted in favor of jurisdiction in the United Kingdom.[33] The Clerk of Court is directed to enter judgment accordingly and to close the above-captioned action.

**IT IS SO ORDERED.**

case." *Kilvert,* 906 F.Supp. at 794 (citing *Williams v. Green Bay & Western R.R. Co.,* 326 U.S. 549, 557, 66 S.Ct. 284, 90 L.Ed. 311 (1946)). The Supreme Court has stressed "the need to retain [this] flexibility" and has consistently refused to "lay down a rigid rule to govern discretion...." *Id.* (citing *Piper Aircraft,* 454 U.S. at 249, 102 S.Ct. 252). Were our dismissal against Web on the merits deemed not to be proper, given the likelihood this litigation would then be fractured due to jurisdictional concerns, it would be appropriate to stay Odyssey's proceedings against Web pending the outcome of the remainder of this action in Britain. *See WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 75 (2d Cir.1997) (authorizing stay pursuant to "the power inherent in every court to control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants") (quoting *Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir.1964)); *O'Dean v. Tro-*

*picana Cruises International, Inc.,* No. 98 Civ. 4543, 1999 WL 335381, at *4 (S.D.N.Y. May 25, 1999) (same, especially where "collateral estoppel is at least potentially available"); *Evergreen Marine Corp. v. Welgrow International, Inc.,* 954 F.Supp. 101, 103–105 (S.D.N.Y. 1997) (authorizing stay in U.S. proceedings pending parallel foreign action based on *forum non conveniens* analysis).

33. The Court remains mindful of the Second Circuit's admonition that "dismissal for *forum non conveniens* is not appropriate ... absent a commitment by [any remaining defendants] to submit to the jurisdiction of the [alternate forum]." *Jota,* 157 F.3d at 159. However, in this case, the American SCB defendants agreed to submit to British jurisdiction before Judge Kaplan. *See* Tr. at 9; SCB Mem. at 30, n. 26. Furthermore, all other remaining defendants are already subject to such jurisdiction.