Richard L. KALNIT, Plaintiff,

v.

Frank M. EICHLER, Robert L. Crandall, Charles P. Russ, III, Pierson M. Grieve, Louis A. Simpson, Allan D. Gilmour, Charles M. Lillis, Grant A. Dove, John Slevin, Kathleen A. Cote, Daniel W. Yohannes, and Mediaone Group, Inc., Defendants.

No. 99 Civ. 3306(SAS).

United States District Court,
S.D. New York.

March 24, 2000.

Lee Squitieri, Stephen J. Fearon, Jr., Abbey, Gardy & Squitieri, LLP, New York City, for plaintiff.

Dennis J. Block, James M. Halper, Cadwalader, Wickersham & Taft, New York City, for defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This is an uncertified securities fraud class action brought by plaintiff Richard L. Kalnit against MediaOne Group Inc. ("MediaOne") and its eleven directors.[1] Plaintiff alleges that defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by fraudulently failing to disclose material information in connection with a proposed merger between MediaOne and Comcast Corporation ("Comcast"). Plaintiff and the purported class members seek money

---

1. The MediaOne defendant directors are Frank M. Eichler, Robert L. Crandall, Charles P. Russ III, Pierson M. Grieve, Louis A. Simpson, Allan D. Gilmour, Charles M. Lillis, Grant A. Dove, John Slevin, Kathleen A. Cote and Daniel W. Yohannes (collectively, the "Directors" or "individual defendants").

damages claiming that, as a result of defendants' alleged fraud, they sold shares of MediaOne at an artificially deflated price.

Plaintiff filed his original class action complaint on May 6, 1999. On October 7, defendants moved to dismiss the original complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. By opinion dated December 22, this Court granted defendants' motion in its entirety, finding that plaintiff failed to adequately allege the required element of scienter. *See Kalnit v. Eichler*, 85 F.Supp.2d 232 (S.D.N.Y. 1999). Dismissal was granted with leave to amend. *See id.*

On January 13, 2000, plaintiff filed an amended class action complaint ("Amended Complaint"). Defendants now move to dismiss the Amended Complaint contending that plaintiff's allegations of scienter are still inadequate to sustain a claim for relief under the federal securities laws. For the reasons that follow, defendants' motion is granted in its entirety.

## I. Legal Standard

Defendants' motion to dismiss the Amended Complaint, like its motion to dismiss the original complaint, is brought pursuant to Rule 12(b)(6), for failure to state a claim upon which relief may be granted, and Rule 9(b) and the PSLRA, for failure to plead fraud with particularity.

■ Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of N.Y.*, 186 F.3d 243, 247 (2d Cir. 1999). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.

1998) (internal quotations omitted). Thus, to properly rule on such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Harris*, 186 F.3d at 247. Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (internal quotations omitted). In deciding a Rule 12(b)(6) motion, the district court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits or documents incorporated in the complaint by reference. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999). However, in securities fraud actions, the court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC...." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

Rule 9(b) sets forth additional pleading requirements with respect to allegations of fraud. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." But, under Rule 9(b), "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."

■ Securities fraud actions are subject to the requirements of Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). However, the PSLRA heightened that Rule's requirement for pleading scienter. *See* 15 U.S.C. § 78u–4(b)(3)(A); *see also Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999). As a result, in securities fraud actions, scienter may not be averred generally. Rather, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Press*, 166 F.3d at 538 (quoting 15 U.S.C. § 78u–

4(b)(3)(A)); *see also Chill v. General Elec. Co.,* 101 F.3d 263, 268–69 (2d Cir.1996).

## II. Background

### A. Factual Background[2]

The facts set forth below are taken from the Amended Complaint. They are presumed true for purposes of this motion.

MediaOne is a Delaware corporation that provides telecommunications services. Amended Complaint ¶ 29. In 1996, MediaOne purchased a company called Continental Cablevision ("Continental"). *Id.* ¶ 49. As part of its acquisition of Continental, MediaOne entered into a publicly-disclosed shareholder's agreement with Continental's co-founder, Amos Hostetter. *Id.* This agreement included a "standstill restriction" which limited Hostetter's ability to propose mergers involving MediaOne. *Id.* At all relevant times, Hostetter owned approximately 56.32 million MediaOne shares (or 9.33% of all outstanding MediaOne shares). *Id.* ¶ 50.

On March 22, 1999, MediaOne announced that it had entered into a definitive merger agreement with Comcast whereby Comcast would acquire MediaOne for approximately $48 billion in an all-stock deal ("Comcast Agreement"). *Id.* ¶ 51. The Comcast Agreement called for each MediaOne shareholder to receive 1.1 shares of Comcast Class A Special Common Stock, or $80.16 per share. *See id.* ¶ 2; MediaOne 3/22/99 Form 8–K, Ex. B to 2/28/00 Affidavit of Dennis Block ("Block Aff."), at 99.1.

Under the Comcast Agreement, MediaOne had forty-five days within which to accept a superior proposal, subject to the payment of a $1.5 billion termination fee to Comcast. *Id.* ¶ 55. The Comcast Agreement also included a "No Shop" provision which prohibited MediaOne and its Directors from soliciting competing merger proposals. *Id.* ¶¶ 52–53. The No Shop provision, set forth in section 6.03 of the Comcast Agreement, stated:

> From the date hereof until the termination hereof, MediaOne will not, and will cause the MediaOne Subsidiaries and the officers, directors, employees, investment bankers, attorneys, accountants, consultants or other agents or advisors of MediaOne and the MediaOne Subsidiaries not to, directly or indirectly: (i) take any action to solicit, initiate, facilitate or encourage the submission of any Acquisition Proposal; and (ii) other than in the ordinary course of business and not related to an Acquisition Proposal, engage in any discussions or negotiations with, or disclose any non-public information relating to MediaOne or any MediaOne Subsidiary or afford access to the properties, books or records of MediaOne or any MediaOne Subsidiary to, any Person who is known by MediaOne to be considering making[,] or has made, an Acquisition proposal.

*Id.* ¶ 52. Thus, although MediaOne could accept a superior proposal within forty-five days of the scheduled closing of the MediaOne/Comcast merger, it could not directly or indirectly solicit such proposals. Section 10.1 of the Comcast Agreement permitted Comcast to terminate the proposed merger in the event MediaOne breached its No Shop obligations. *Id.* ¶ 54.

On March 25, 1999, Hostetter sent a letter to the Directors sharply criticizing the terms of the Comcast Agreement and seeking to be released from the 1996 standstill restriction so that he could pursue and develop a superior merger proposal. *Id.* ¶ 57. The text of Hostetter's March 25 letter reads in pertinent part as follows:

> gations that have since been added to the Amended Complaint. Accordingly, I review the facts in some detail above, both because they are relevant to the instant motion and because many are pleaded for the first time.

---

**2.** The background of this case is largely set forth in the December 22 opinion. *See Kalnit,* 85 F.Supp.2d at 234–35. However, plaintiff's original complaint was poorly drafted and failed to include many basic factual alle-

It appears that the proposed acquisition of MediaOne by Comcast will result in the Roberts family, with less than a 1% economic interest in the combined companies, controlling more than 80% of all voting power. Because MediaOne stockholders would give up voting stock for non-voting stock in an entity controlled by the Roberts family, this transaction constitutes a sale of control with the result that *your duty is to maximize the price for stockholders,* who under the proposed transaction will lose any further opportunity to realize a control premium for their shares.

As best I can determine, you have failed to secure any protections to assure MediaOne stockholder participation in any subsequent sale of control; those in control of Comcast could turn around after the proposed merger and auction off their voting control of MediaOne or the combined entity at a huge premium....

In addition, the proposed sale of control at an uncollared value has been advantaged prematurely and excessively by defensive deal protections such as the no solicitation provisions and the $1.5 billion termination fee payable to Comcast. These might have been sustainable as post-auction measures if needed to preserve maximized value, but they are entirely inappropriate as pre-auction measures, given their deterrent effect on other offers and the dollar-for-dollar reduction in benefit to stockholders if a topping offer were to be made.

I am advised that, as the Delaware Supreme Court stated in its Revlon decision and reiterated in its Paramount/QVC ruling, once you took steps to sell control of MediaOne and to protect that sale rather than to maximize value for shareholders, all defensive measures became moot. *Your duty was and is to be especially active and diligent to get the best price for MediaOne stockholders.*

Accordingly, I request that the board of directors on behalf of the Company agree that any and all standstill restrictions in the Shareholders Agreement dated February 27, 1996 ... are now null and void and of no further effect, and that the board on behalf of the Company consent to the waiver of all such terms in order to permit me to publicly express my view that this sale of control is inadvisable and work with others to develop a superior proposal. I am prepared to enter into a confidentiality agreement with the Company on terms no less favorable to the Company than those previously agreed to by Comcast.

Although time is limited, I believe that *you have a duty under these circumstances to permit me to seek superior value and terms. ...*

*Id.* ¶ 57 (quoting text of 3/25/99 letter from Hostetter to Directors) (emphasis added).

Defendant Eichler, MediaOne's President, Legal Counsel and Secretary, responded to Hostetter's request on behalf of the Directors in a letter dated March 31, 1999. *Id.* ¶¶ 31, 63. In their March 31 letter, the Directors agreed to release Hostetter from the 1996 standstill restriction. *Id.* ¶ 63. The Directors also acknowledged and accepted Hostetter's agreement " 'not to make any public announcement of [his] efforts to develop a superior proposal without the Directors' written consent, and to respond with 'no comment' if a press inquiry is made.' " *Id.* (quoting 3/31/99 letter from Eichler to Hostetter). Following his release from the standstill restriction, Hostetter immediately entered into discussions with third parties regarding the acquisition of MediaOne. *Id.* ¶ 69.

On April 5, 1999, MediaOne filed a Proxy Statement pursuant to section 14(a) of the Exchange Act. *Id.* ¶ 65. Although the April 5 Proxy Statement discussed the proposed Comcast merger, it made no reference to the March 25 and March 31 letters. *Id.* ¶ 66. Nor did the Proxy

Statement disclose the Directors' release of Hostetter from the 1996 standstill restriction. *Id.*

Plaintiff sold 1,820 shares of MediaOne stock at $65 ⁷⁄₁₆ per share on April 16, 1999. *Id.* ¶ 68. On April 22, AT & T Corporation ("AT & T") publicly proposed an acquisition of MediaOne for approximately $58 billion; the AT & T proposal was $9 billion more than the Comcast proposal. *Id.* ¶ 70. That same day, Hostetter filed a Schedule 13D with the Securities and Exchange Commission disclosing the March 25 and March 31 letters. *Id.* ¶ 71. The Schedule 13D also states that the AT & T merger proposal was a direct result of Hostetter's efforts to procure a superior offer for MediaOne. *Id.* ¶ 72.

On April 22, the date of both the AT & T announcement and the disclosure of the Hostetter letters, MediaOne's stock was valued at $69.50 per share. *Id.* ¶ 74. The following day, April 23, MediaOne's stock closed at $77.375 per share. *Id.* Four days later, on April 27, MediaOne's stock closed at $81.8125 per share. *Id.* ¶ 75.

On May 1, the individual defendants unanimously agreed to terminate the Comcast Agreement and to accept the AT & T proposal. *Id.* ¶ 76. Because of its decision to accept a superior offer, MediaOne was obligated to pay Comcast $1.5 billion. *Id.* ¶ 77. In addition, AT & T and Comcast reached a separate agreement pursuant to which Comcast agreed not to interfere with the AT & T/MediaOne merger in exchange for certain valuable cable properties. *Id.* ¶ 78. MediaOne officially terminated the Comcast Agreement on May 6, the same day Kalnit filed his original class action complaint. *Id.* ¶ 80.

### B. Allegations of the Amended Complaint

The original complaint asserted violations of section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. I dismissed the original complaint because plaintiff failed to sufficiently allege a required element of securities fraud, namely that defendants acted with scienter.[3] On January 13, 2000, plaintiff filed the Amended Complaint. In the Amended Complaint, plaintiff seeks to represent a class of persons who sold MediaOne shares between March 31 and April 22, 1999. *Id.* ¶ 41. Similar to the original complaint, the Amended Complaint asserts a single claim against all defendants pursuant to section 10(b) and Rule 10b–5. *Id.* § 57 94–103.[4]

The theory of liability set forth in the original complaint and the Amended Complaint is the same. Plaintiff contends that defendants' failure to disclose Hostetter's authorization to seek superior merger proposals artificially depressed the market for MediaOne shares causing plaintiff and other class members to sell their MediaOne shares at a deflated price. *Id.* ¶¶ 17, 24, 48, 81, 101. Specifically, plaintiff alleges that defendants had a duty to publicly disclose information regarding Hostetter's release from the 1996 standstill agreement. *Id.* ¶ 93. Plaintiff further alleges that because defendants concealed the fact that Hostetter was actively pursuing superior merger proposals—something MediaOne and its Directors could not do—the market undervalued MediaOne stock. *Id.* ¶¶ 17, 24, 47–48, 101. As a result, the Amended Complaint asserts, when plaintiff and the purported class members sold their stock prior to April 22, they sold their stock for less than it was worth. *Id.*[5]

---

3. In his original complaint, plaintiff also asserted a claim against the individual defendants for controlling person liability pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). In the December 22 opinion, I dismissed plaintiff's section 20(a) claim finding that, among other things, defendants were not "control persons" within the meaning of the statute. *See Kalnit,* at 245.

4. The Amended Complaint does not include a claim against the individual defendants for controlling person liability under section 20(a).

5. Plaintiff sets forth a "fraud on the market" theory, asserting that he and the purported class members relied on the integrity of the securities market when they sold their Me-

## III. Discussion

■ To state a claim under section 10(b) and Rule 10b–5, plaintiff must allege that in connection with the purchase or sale of securities: (i) defendants made a false material representation or omitted to disclose material information; (ii) defendants acted with scienter; and (iii) plaintiff detrimentally relied upon defendants' fraudulent acts. *See Press,* 166 F.3d at 534. In addition, as discussed *supra* Part I, plaintiff must allege elements one and two—fraudulent acts and scienter—with particularity in order to meet the heightened pleading requirements set forth in Rule 9(b) and the PSLRA.

In his original complaint, plaintiff adequately alleged the elements of fraudulent acts and detrimental reliance. *See Kalnit,* 85 F.Supp.2d at 240–42.[6] However, I dismissed the original complaint because plaintiff failed to sufficiently allege the element of scienter. *Id.* at 245. Accordingly, the sole issue to be resolved on this motion is whether the Amended Complaint cures the defects of the original complaint by adequately alleging defendants' scienter.

### A. Scienter: Generally

The gravamen of plaintiff's fraud claim is that because defendants failed to disclose Hostetter's release from the 1996

diaOne shares, and that defendants' fraudulent actions compromised the integrity of that market. *See* Amended Complaint ¶¶ 47–48; *Kalnit,* 85 F.Supp.2d at 240–41.

6. My conclusions with respect to plaintiff's allegations of fraudulent acts and detrimental reliance are set forth fully in the December 22 opinion and will not be repeated here.

7. Specifically, I determined that plaintiff adequately alleged the materiality of, and a corresponding duty to disclose, Hostetter's release because "a reasonable juror could arguably find that the 'total mix' of information changed when Hostetter was permitted to actively seek and develop a superior merger proposal, something MediaOne and its board could not do." *Kalnit,* 85 F.Supp.2d at 240. However, the materiality of Hostetter's release presented a difficult and close question in light of the fact that MediaOne expressly

standstill, the market price for MediaOne shares was artificially depressed and, as a result, plaintiff sold his shares of MediaOne on April 16 for less than they were worth. In the December 22 opinion, I found that plaintiff had sufficiently—although just barely—pleaded that the failure to disclose Hostetter's release was a "fraudulent act" for purposes of section 10(b).[7]

It is a well-settled principle that "not every instance of financial unfairness constitutes fraudulent activity under [section] 10(b)." *Chiarella v. United States,* 445 U.S. 222, 232, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (citing *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 463, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)). "In particular, no private cause of action for damages will lie under section 10(b) and Rule 10b–5 'in the absence of an[ ] allegation of scienter—intent to deceive, manipulate, or defraud.' " *Gross v. Damon Corp.,* 94 Civ. 4457, 1995 WL 138612,*3 (S.D.N.Y. Mar. 29, 1995) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)); *see also Santa Fe Indus.,* 430 U.S. at 463, 97 S.Ct. 1292 ("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception.").

disclosed that it could accept superior proposals received within forty-five days of its March 22 Comcast merger announcement. *See id.* at 239. As stated in this Court's prior opinion:

> The March 22 disclosure was sufficient to put reasonable investors on notice that MediaOne was "in play" among corporations and investment bankers seeking merger opportunities during a limited time-period; it is hard to imagine how information regarding Hostetter's ability to also seek merger opportunities for MediaOne during that time period would significantly alter the "total mix".
>
> That said, I decline to find at this preliminary stage that "no reasonable jury could determine that the undisclosed [information regarding Hostetter] would have assumed actual significance in the deliberations" of investors. *Press,* 166 F.3d [at] 538 (internal quotations omitted).

*Kalnit,* 85 F.Supp.2d at 239.

Therefore, although plaintiff has sufficiently alleged a fraudulent act (defendants' failure to disclose Hostetter's release) and a resulting harm (plaintiff's sale of his MediaOne shares at a deflated price), such allegations, in and of themselves, are insufficient to state a claim for fraud under federal securities law because plaintiff must allege that defendant acted with scienter.

■ As stated above, *see supra* Part I, in order to properly assert scienter under the heightened pleading requirements set forth in the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). *See also Press,* 166 F.3d at 537–38. Accordingly, a plaintiff cannot plead scienter based upon speculation and conclusory allegations, but "must allege facts that give rise to a strong inference of fraudulent intent." *Chill,* 101 F.3d at 267 (internal quotations omitted). A "strong inference" of fraudulent intent may be established by alleging (i) facts that demonstrate defendants' motive and opportunity to commit fraud; or (ii) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Press,* 166 F.3d at 538.

### B. Scienter: Motive and Opportunity

The first method of pleading scienter is by alleging both motive and opportunity to commit fraud. It is undisputed that the individual defendants, as Directors of MediaOne, had the opportunity to commit fraudulent acts. The critical issue is whether they were motivated to do so.

"Motive" to commit fraud "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *See Shields,* 25 F.3d at 1130. Fraudulent motive is generally demonstrated through allegations of insider trading or some other type of pecuniary gain by company insiders at the expense of shareholders.

For example, motive was adequately pleaded in a class action suit in which shareholders alleged that a corporation and its CEO made misleading statements in violation of section 10(b) in order to manipulate the price of the company's stock so that the CEO could sell his shares at inflated prices. *See Stevelman v. Alias Research, Inc.,* 174 · F.3d 79, 85 (2d Cir. 1999). In another recent class action suit, shareholders similarly alleged that the corporation and its eight directors violated section 10(b) by making misleading statements regarding the company's performance in order to inflate the price of the company's stock so that the directors could subsequently profit from insider sales. *See In re Quintel Entertainment Inc. Sec. Litig.,* 72 F.Supp.2d 283, 296–97 (S.D.N.Y. 1999). Noting that the large number of defendants making insider trades indicated unusual insider trading activity, the court found that the plaintiffs had adequately demonstrated scienter. *See id.*

Plaintiff's original complaint failed to set forth any allegations of insider trading. Indeed, the original complaint made no mention of any motive by defendants to defraud MediaOne shareholders. As stated in this Court's prior opinion:

> [T]he [original complaint] is utterly silent on the question of motive. Nowhere in the [original complaint] does plaintiff allege that defendants benefitted from the alleged misrepresentation and omission. Nor are there any facts from which an inference of motive can be drawn. Put simply, there is no indication that defendants profited from their alleged material omissions.

*Kalnit,* 85 F.Supp.2d at 243.

In contrast to the original complaint, the Amended Complaint is far from "silent" on the question of motive. Indeed, plaintiff's current pleading includes an entire section entitled "Additional Motive Allegations" which is comprised of numerous theories as to how defendants could have profited from their failure to disclose Hostetter's release from the 1996 standstill. Amended

Complaint ¶¶ 82–93. Despite the volume of "additional" motive allegations, however, plaintiff fails to cure the defects of the original complaint. Not only have plaintiff's new allegations of motive been routinely rejected by courts in the Second Circuit as insufficient evidence of scienter, they simply do not—even under the most generous of readings—give rise to a "strong inference" of defendants' intent to deceive, manipulate or defraud MediaOne shareholders.

Plaintiff's new motive allegations can be grouped into two general claims. *First,* plaintiff contends that defendants concealed the Hostetter release in order "to avoid being declared in breach of the Comcast Agreement." Amended Complaint ¶¶ 83–84. *Second,* plaintiff contends that defendants concealed the Hostetter release in order to depress the price of MediaOne stock and to thereby "make it easier" to accept a superior AT & T offer. *Id.* at ¶¶ 88–89. These claims are addressed in turn below.

### 1. Desire to Avoid Being Declared in Breach of the Comcast Agreement

Similar to the original complaint, the Amended Complaint makes no allegations of insider trading by the individual defendants. For example, unlike the plaintiffs in *Stevelman* and *Quintel,* plaintiff here does not contend that the Directors concealed Hostetter's release in order to depress MediaOne stock so that they could purchase shares of MediaOne at deflated prices and then sell those shares at a profit when the value of MediaOne stock increased in the wake of the AT & T and Hostetter announcements. In short, there is no claim that the Directors bought or sold MediaOne stock during the relevant period. Instead, the bulk of plaintiff's motive allegations concern "the substantial concrete benefits [stemming from] MediaOne's merger with Comcast which defendants sought to preserve." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's

Amended Class Action Complaint ("Pl. Opp.") at 14.

Plaintiff claims that "[d]efendants concealed the Hostetter Waiver Letters in order to avoid being declared in breach of the Comcast Agreement, which specifically prohibited defendants from 'directly or indirectly ... tak[ing] any action to solicit, initiate, facilitate or encourage the submission of any Acquisition Proposal'". Amended Complaint ¶ 83. According to plaintiff, "[h]ad defendants disclosed the existence of the Hostetter Waiver Letters, Comcast could terminate the Comcast Agreement, subjecting defendants to significant liability for breach of contract, subjecting MediaOne to a $1.5 billion termination fee, and depriving defendants of their ability to realize substantial personal profit as a result of the Comcast Merger." *Id.* In addition, plaintiff contends that "had the disclosure of the Hostetter Waiver Letters caused Comcast to determine that MediaOne was in breach of the Comcast Agreement, Hostetter may not have [been] able to pursue the AT & T Agreement thereby depriving the defendants and Hostetter of a superior offer for their stock and the stock of the other MediaOne shareholders." *Id.* ¶ 84.

Stated succinctly, plaintiff alleges that by concealing Hostetter's release from the standstill restriction, the individual defendants hoped to prevent Comcast from terminating the proposed merger and to thereby realize the following four concrete benefits: (i) substantial personal profit as a result of the Comcast merger; (ii) avoidance of personal liability for breach of the Comcast Agreement; (iii) avoidance of an obligation to pay a $1.5 billion termination fee; and (iv) the ability to pursue a more lucrative merger with AT & T. Plaintiff contends that the Directors' desire to receive these four benefits gives rise to a "strong inference" that the Directors' intended to defraud MediaOne shareholders.

■ Before turning to an individualized discussion of these alleged concrete benefits, it is important to note a subtle but

fundamental flaw in plaintiff's first theory of scienter; namely, that with respect to preservation of the Comcast Agreement, the interests of MediaOne and its shareholders were aligned rather than adverse. In other words, because preservation of the Comcast Agreement benefitted both the Directors and the MediaOne shareholders, it is difficult to infer an intent to defraud those shareholders absent some allegation of stock manipulation or insider trading by the Directors.[8]

Under the Comcast Agreement, Comcast promised to acquire MediaOne for $48 billion. The Amended Complaint does not allege that the Comcast Agreement was poor or unfavorable in any way to MediaOne shareholders. Nor does the Amended Complaint allege that plaintiff or any MediaOne shareholder other than Hostetter was unhappy with the terms of the Comcast/MediaOne deal.

■ The Amended Complaint does allege that on March 25, 1999, Hostetter wrote a letter to the Directors sharply criticizing the terms of the Comcast Agreement. In particular, Hostetter told the Directors: "Your duty was and is to be especially active and diligent *to get the best*

price for MediaOne stockholders." *Id.* ¶ 57 (quoting 3/31/99 letter from Eichler to Hostetter (emphasis added)).[9] According to Hostetter, in order for the Directors to properly fulfill their duty to MediaOne shareholders, they needed to release him from the 1996 standstill so that he could solicit superior merger proposals. As Hostetter stated in his letter: "I believe that you have a duty under these circumstances to permit me to seek superior value and terms." *Id.* Thus, taking the allegations of the Amended Complaint as true, MediaOne released Hostetter from the 1996 standstill so that he could attempt to procure a better deal for MediaOne shareholders. Accordingly, there can be little question that the release of Hostetter was, at minimum, for the benefit of both MediaOne Directors and MediaOne shareholders.[10]

The hotly contested issue, of course, is the Directors' agreement with Hostetter not to " 'make any public announcement of [Hostetter's] efforts to develop a superior proposal without the Directors' written consent.' " *Id.* ¶ 63 (quoting 3/31/99 letter from Eichler to Hostetter). Again, the gravamen of plaintiff's fraud claim is that

---

**8.** In connection with plaintiff's first theory of scienter, not only are there no allegations of insider trading, but plaintiff does not allege that defendants' depressed or manipulated MediaOne stock in order to preserve the Comcast Agreement. The only allegation of stock manipulation is in connection with plaintiff's second theory of scienter in which plaintiff claims that defendants' sought to depress the price of MediaOne stock in order to make it easier for them to accept the AT & T proposal. *See infra* Part III.B.2.

**9.** Indeed, in his March 31 letter, Hostetter invokes the seminal fiduciary duty cases of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985) and *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del.1994). *See supra* Part II.A. In *QVC*, the Delaware Supreme Court stated: "In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end." 637 A.2d at

44. Similarly, in *Revlon*, the Delaware Supreme Court held that "[t]he duty of the board ... [is] the maximization of the company's value at a sale for the stockholders' benefit", and that "obtaining the highest price for the benefit of stockholders should [be] the central theme guiding director action." 506 A.2d at 182.

Notably, both *Revlon* and *QVC* state that although "no shop" provisions such as the one included in the Comcast Agreement are not per se illegal, they are "invalid and unenforceable" to the extent they "purport[ ] to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties." *QVC*, 637 A.2d at 51; *see also Revlon*, 506 A.2d at 184 ("The no-shop provision ... while not per se illegal, is impermissible ... when a board's primary duty becomes that of an auctioneer responsible for selling the company to the highest bidder.").

**10.** According to the Amended Complaint, Hostetter was at all relevant times MediaOne's largest shareholder. Amended Complaint ¶ 50.

defendants' failure to disclose information regarding Hostetter's release caused plaintiff to sell his shares for less money than they were worth. As set forth above, however, plaintiff must allege not just that defendants and Hostetter agreed to conceal Hostetter's release, but also that the concealment was motivated by an intent to defraud shareholders.

In an effort to plead the required state of mind, plaintiff claims that the Directors' decision to conceal Hostetter's release was motivated by MediaOne's desire to keep this information from Comcast in order to prevent Comcast from terminating its agreement to acquire MediaOne prior to MediaOne's receipt of a more lucrative merger proposal. The Amended Complaint expressly states: "A disclosure of the Hostetter Waiver Letters would have revealed that MediaOne was in breach of the No Shop provision which would have cost MediaOne $1.5 billion and jeopardized the Comcast merger *before* MediaOne had a chance to secure a superior proposal." *Id.* ¶ 12 (emphasis in original). Thus, plaintiff himself concedes that the Directors were trying to keep the Comcast deal in place until such time as Hostetter procured a superior offer. Plaintiff alleges that this tactic benefitted the Directors in the four ways stated above. Under plaintiff's theory of motive, however, this tactic also benefitted MediaOne shareholders— including plaintiff.

To illustrate, plaintiff alleges that upon disclosure of the March 25 and March 31 letters, Comcast would have (i) terminated the Comcast Agreement; (ii) sued MediaOne and its Directors for breach of contract; (iii) demanded a payment of $1.5 billion from MediaOne; and (iv) somehow prevented Hostetter from pursuing a deal with AT & T. *Id.* ¶¶ 83–84. Thus, pursuant to plaintiff's theory, if defendants had disclosed the Hostetter release immediately on March 31, then Comcast would have walked away from the merger on that date or soon thereafter, leaving MediaOne without a superior merger proposal or the prospect of a superior merger proposal. In addition, according to plaintiff, MediaOne and its Directors would have been subjected to costly litigation as well as obligated to pay Comcast $1.5 billion. The combined effect of these occurrences would certainly have caused the value of MediaOne's stock to decrease, and possibly even to plummet. MediaOne shareholders would have suffered accordingly.

In contrast, by concealing the March 25 and March 31 letters, MediaOne managed to preserve the Comcast Agreement and to stave off plaintiff's alleged parade of horribles until it received a superior offer from AT & T, at which point the Directors revealed to Comcast and the public their release of Hostetter. In this fashion, MediaOne shareholders received the "best price" for their shares with, according to plaintiff's theory, the least possible risk.

At first glance, it may appear that concealment of the Hostetter release benefitted only those MediaOne shareholders who held their MediaOne stock until after the April 22 announcement. However, based upon the allegations in the Amended Complaint, even shareholders like plaintiff who sold MediaOne stock prior to April 22 benefitted from concealment of the release. For example, if defendants had disclosed the Hostetter release on March 31 and Comcast had withdrawn from the merger agreement, initiated suit and demanded payment of $1.5 billion, then when plaintiff sold his shares two weeks later, it is likely those shares would have been worth far less than the $65 per share plaintiff received. In other words, when plaintiff sold his shares on April 16, he too benefitted from the fact that the Comcast Agreement was still intact.[11] Moreover, even if plaintiff had not benefitted in any way from defendants' concealment of the Hostetter

---

11. As set forth *supra* note 5, plaintiff has alleged a fraud on the market theory of causation in which the harm suffered stems from the market's undervaluation of MediaOne stock, not plaintiff's decision to sell that stock.

release, the relevant issue is not whether defendants' failure to disclose harmed plaintiff, but whether plaintiff has alleged facts which give rise to a strong inference that defendants' failure to disclose was motivated by an intent to deceive, manipulate and defraud shareholders. Here, accepting all the allegations of the Amended Complaint as true, the only "strong inference" that can be drawn is an intent by defendants to defraud Comcast for the benefit of MediaOne and its shareholders. Any inference that the Directors intended to defraud their own shareholders is both speculative and unreasonable because it ignores facts that plaintiff himself sets forth.[12]

Keeping in mind the inherent difficulty in any allegation of scienter based upon the Directors' desire to preserve the Comcast Agreement, I briefly address additional reasons why the four concrete benefits asserted by plaintiff cannot give rise to an inference of fraudulent intent.

### a. Substantial Personal Profit as a Result of the Comcast Merger

Plaintiff asserts that the Directors desired to conceal Hostetter's release in order to prevent Comcast from terminating the proposed merger and to thereby avoid "losing the substantial benefits that they would personally receive under the Comcast Agreement." *Id.* ¶ 84. Specifically, plaintiff claims that the individual defendants hoped to protect "the significant payments they would receive under the change in control provisions in their em-ployment contracts as a result of the Comcast Merger." *Id.; see also id.* ¶ 85. In addition, plaintiff asserts that four of the Directors hoped to protect "lucrative executive and directorial positions that they negotiated as part of the Comcast Agreement." *Id.* ¶¶ 86–87.

Plaintiff's allegations regarding the Directors' desire to realize personal benefits under the Comcast Agreement are neither implausible nor unreasonable. A jury could certainly find that the Directors hoped to receive increased compensation, lucrative executive positions and other corporate perquisites as a result of the Comcast merger.[13] In fact, the reasonableness of plaintiff's allegations is precisely the problem. Every corporate director in America hopes to receive personal benefits when his or her company enters into a merger agreement. Thus, to recognize an inference of fraudulent intent based upon a corporate director's desire to realize personal benefits in connection with a merger would subject corporate directors to claims of securities fraud following every corporate merger or other business combination. Not surprisingly, courts in the Second Circuit and elsewhere have routinely found that such generalized allegations of motive are insufficient to plead the element of scienter.

For example, in *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995), the plaintiffs alleged that corporate officers of IMCERA Group "were motivated to inflate the value of IMCERA stock be-

---

**12.** Part of the difficulty of pleading scienter where the alleged fraud involves a corporate merger is that mergers subject corporate officers to a unique code of conduct and fiduciary duties. For example, as stated *supra* note 9, under Delaware state law, "[i]n the sale of control context the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders." *QVC,* 637 A.2d at 44. As a result, it is difficult to parse through actions motivated by legitimate fiduciary obligations and actions motivated by fraudulent intent absent clear allegations of fraudulent activity such as insider trading.

**13.** Similarly, accepting as true the allegations of the Amended Complaint, it is a reasonable position that Comcast might consider the Directors' release of Hostetter an "indirect" solicitation of competing merger proposals and a breach of MediaOne's No Shop obligations. Thus, a reasonable juror could find that upon learning of defendants' waiver of Hostetter's standstill restriction, Comcast would choose to exercise its rights under the Comcast Agreement and to walk away from the proposed merger with MediaOne.

cause the increase in stock price had a direct effect on their executive compensation." The Second Circuit rejected the plaintiffs' allegation as insufficient to plead scienter:

> Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price would be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. Therefore, we hold that the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.

*Id.* (internal quotations and citations omitted). The plaintiff in *Shields* also attempted to plead scienter based upon generalized allegations of motive, including the defendants' desire "to induce plaintiff and the other members of the Class to purchase Citytrust common stock ... at artificially inflated prices so that individual defendants could protect their executive positions and the compensation and prestige they enjoy thereby." 25 F.3d at 1130 (alteration in original). The Court of Appeals rejected the plaintiff's allegation of fraudulent intent stating that

> [t]o allege a motive sufficient to support the inference [of fraudulent intent], a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.... If motive could be pleaded by alleging the defendant's desire for continued employment ... the required showing of motive would be no realistic check on aspersions of fraud....

*Id.*

More recently, in *Chill,* the Second Circuit held that a "generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not suffi-

ciently concrete for purposes of inferring scienter." 101 F.3d at 268. The *Chill* court rejected the plaintiff's attempt to plead scienter based upon the defendants' alleged desire to maintain the appearance of corporate profitability finding that "[i]f we accept this as sufficient motive, then we must accept as motive that every publicly-held corporation desires its stock to be priced highly by the market. At that point, the motive requirement becomes meaningless." *Id.* at 268 n. 5.

█ Because the desire to realize personal benefits as a result of a merger can be imputed to any corporate officer, such motive cannot legally give rise to a "strong inference" of the Directors' intent to defraud MediaOne shareholders. *See Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 623 (4th Cir.1999) ("Similar situations arise in every merger; thus, allowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions every time that company effected a merger or acquisition." (citing Second Circuit law)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813–14 (2d Cir.1996) (finding "company's desire to maintain a high bond or credit rating" insufficient motive for fraud because such motive could be imputed to any company); *Leventhal v. Tow,* 48 F.Supp.2d 104, 115 (D.Conn.1999) ("[T]he allegation that the defendants artificially inflated Citizens' stock price in order to 'protect and enhance their executive positions' and 'negotiate as favorable a deal as possible' on a pending employment contract also fail to give rise to a strong inference of scienter. This motive has been rejected routinely."); *Herzog v. GT Interactive Software Corp.,* 98 Civ. 0085, 1999 WL 1072500, *9 (S.D.N.Y. Nov. 29, 1999) (defendant's " 'desire to consummate [a] corporate transaction does not constitute a motive for securities fraud' ");

*Thacker v. Medaphis Corp.*, 97 Civ. 2849, 1998 WL 684595, *3 (S.D.N.Y. Sept. 30, 1998) (finding plaintiff's claim that defendant was motivated by a desire to eliminate competitors and to acquire related companies insufficient to plead scienter because such motive could be imputed to any corporate officer); *Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1414 (S.D.N.Y.1996) (finding "generalized interest in executive compensation tied to stock performance" and desire "to maintain perquisites of corporate rank do[ ] not support a strong inference of fraud").

### b. Avoidance of Liability for Breach of the Comcast Agreement

Plaintiff next alleges that defendants were motivated to defraud MediaOne shareholders based on their desire to avoid "significant liability" for breach of the Comcast Agreement. It is unclear from the face of the Amended Complaint whether plaintiff is referring to the Directors' desire to avoid "personal" liability for their alleged breach of the Comcast Agreement or to a more general desire to protect MediaOne from such a suit. To the extent plaintiff is referring to the individual defendants' desire to protect MediaOne from protracted and costly litigation, such allegation is insufficient to plead scienter both because it is a motive that can be imputed to any corporate director and because it is a motive that is in the best interests of MediaOne shareholders for the reasons stated above. *See supra* Part III.A.1.

▮ To the extent plaintiff alleges that the Directors desired to avoid personal liability, it is patently unreasonable to conclude that Comcast could or would sue the Directors personally in the event MediaOne violated the No Shop provision. Nowhere in the Amended Complaint does plaintiff allege that the Comcast Agreement permitted Comcast to bring suit for breach of contract against either the Di-

rectors or MediaOne for violation of section 6.03. Nor is it reasonable to assume that Comcast could somehow pierce the corporate veil and subject the Directors to "significant liability" as a result of their alleged breach. As set forth by plaintiff himself, the Comcast Agreement explicitly provided for a single remedy in the event MediaOne breached its No Shop obligations—termination of the merger agreement. Plaintiff's conclusory and unsupported allegations regarding additional actions that Comcast might take to remedy breach of the No Shop provision such as bringing suit against the Directors (or MediaOne) cannot, as a matter of law, form the basis for an inference of scienter. As the Second Circuit has repeatedly stated, plaintiffs do not "enjoy a 'license to base claims of fraud on speculation and conclusory allegations [of scienter].'" *San Leandro*, 75 F.3d at 813 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990)).

### c. $1.5 Billion Termination Fee

Plaintiff's allegation that defendants concealed the Hostetter release in order to avoid payment of a $1.5 billion fee for breach of the No Shop provision is equally speculative. The Amended Complaint merely alleges that, pursuant to section 10.01, Comcast may terminate the Comcast Agreement in the event MediaOne breaches its No Shop obligations. The Amended Complaint does not allege that if MediaOne breaches the contract, Comcast is entitled to both walk away from a merger with MediaOne and to receive a payment of $1.5 billion from MediaOne. The only reference to a $1.5 billion fee is with respect to MediaOne's decision to accept a superior proposal.[14]

### d. Merger with AT & T

▮ Plaintiff also alleges, without any basis in law or fact, that "had the disclo-

---

14. MediaOne in fact paid Comcast $1.5 billion upon its decision to accept the superior

AT & T proposal.

sure of the Hostetter Waiver Letters caused Comcast to determine that MediaOne was in breach of the Comcast Agreement, Hostetter may not have been able to pursue the AT & T Agreement, thereby depriving the defendants and Hostetter of a superior offer for their stock and the stock of the other MediaOne shareholders." Amended Complaint ¶ 84. Plaintiff fails to explain why or how Comcast's determination that MediaOne was in breach of the No Shop provision would preclude Hostetter from pursuing merger discussions with AT & T. Plaintiff's allegation is purely speculative and must be rejected on that basis alone.

The more fundamental problem, however, is that plaintiff's allegation of motive based upon the Directors' supposed desire to protect Hostetter's ability to pursue a deal with AT & T conflicts with plaintiff's allegation of reliance and harm. As explained above and in the December 22 Opinion, plaintiff proceeds via a fraud on the market theory, claiming that defendants' failure to disclose Hostetter's release caused the market to undervalue MediaOne stock. Plaintiff's fraud on the market theory is premised on the idea that Hostetter's authorization to shop the company made it more likely that MediaOne would receive a superior merger offer during the waiting period. Accordingly, if the market had been informed that Hostetter was in fact permitted to solicit competing proposals, it would have valued MediaOne stock more highly.

Now, however, plaintiff claims that if Hostetter's release were disclosed, Comcast would withdraw from the deal and "Hostetter may not have been able to pursue the AT & T Agreement". Amended Complaint ¶ 84. If upon disclosure of his release, Hostetter were precluded from pursuing superior offers, then there would be no reason for the market to have increased the value of MediaOne stock and the basis for plaintiff's assertion of a fraud on the market theory disappears.

## 2. Desire to Depress the Price of MediaOne Stock

Plaintiff's second claim of scienter alleges that defendants "were motivated to conceal the Hostetter Waiver Letters and to keep the price of MediaOne depressed so that, if Hostetter was able to obtain a competing acquisition proposal for MediaOne, defendants would be better able to exercise the 'fiduciary out' provision in the Comcast Agreement by more easily determining that the competing offer was 'superior.'" Id. ¶ 88. According to plaintiff, before the Directors could terminate the Comcast Agreement and accept an alternative merger proposal, "defendants were required to obtain the 'advise [sic] of a financial advisor of nationally recognized reputation' that the competing proposal 'is more favorable to MediaOne's stockholders than the [Comcast] Merger.'" Id. ¶ 89. Plaintiff claims that "[o]ne major fact that the financial advisor would consider in its analysis would be the amount by which the value under the 'Superior Proposal' exceeded the value provided to MediaOne shareholders in the Comcast Transaction." Id. Accordingly, plaintiff concludes, by depressing MediaOne's stock price, defendants would "make it easier for themselves to exercise the 'fiduciary out'" and accept the AT & T proposal. Id. Plaintiff's theory is both speculative and illogical.

*First*, plaintiff contends, based on nothing but conclusory allegations, that a financial analyst would evaluate the relative merits of competing merger proposals based upon the market value of MediaOne common stock on any given day. This is simply inaccurate. Financial analysts evaluate competing merger proposals based upon the various terms of the proposed deals. Here, for example, an analyst would consider, among other things, the fact that AT & T's proposed purchase price was $9 billion more than Comcast's proposed purchase price. A sophisticated analyst would not base its decision to recommend the AT & T proposal on the mere fact that "when AT & T announced its

offer and the market first learned about the Hostetter Waiver Letters on April 22, 1999, MediaOne's stock rose approximately $8.00 per share." *Id.*

*Second,* "[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest." *Shields,* 25 F.3d at 1130. Thus, where "[p]laintiff's view of the facts defies economic reason, ... it does not yield a reasonable inference of fraudulent intent." *Atlantic Gypsum Co. v. Lloyds Int'l Corp.,* 753 F.Supp. 505, 514 (S.D.N.Y.1990); *see also Shields,* 25 F.3d at 1130. In the instant case, plaintiff's theory regarding the individual defendants' desire to depress MediaOne stock defies economic reason. The Directors' self-interest lies in securing the best deal possible for the sale of MediaOne. Thus, if the AT & T proposal were inferior to the Comcast proposal, it would be in the Directors' informed self-interest to reject the AT & T offer and to consummate a merger with Comcast. As a result, there is no sensible reason why the Directors would want to depress MediaOne stock in order to make an inferior AT & T offer appear more valuable. Such a tactic could only result in the Directors' accepting an inferior proposal to their economic detriment. Because it is not in the Directors' informed economic self-interest to depress MediaOne stock in order to disguise an inferior proposal, plaintiff's theory of motive is implausible.

### C. Scienter: Recklessness

As set forth above, fraudulent intent can also be established by alleging facts which constitute "strong circumstantial evidence" of conscious misbehavior or recklessness. *Chill,* 101 F.3d at 268–69. In the securities fraud context, recklessness is "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'" *SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998) (quoting *Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38, 46 (2d Cir.1978)).

The Amended Complaint, like the original complaint, fails to set forth any particularized facts which would support a "strong inference" of recklessness and corresponding fraudulent intent. As I stated in my prior opinion, "there is simply no way that a reasonable jury could consider defendants' conduct reckless behavior." *Kalnit,* 1999 WL 1243868, *11.

Plaintiff ignores this Court's previous holding with respect to recklessness and advances the same argument that was previously rejected, namely that the mere fact that defendants consciously concealed Hostetter's release demonstrates that defendants acted recklessly. *See* Pl. Opp. at 16–21. Plaintiff's argument is no more convincing the second time around.[15]

\* \* \* \* \* \*

15. The only new argument plaintiff advances in support of his allegations of recklessness is based on Delaware caselaw concerning the fiduciary obligations owed by directors to shareholders. *See* Pl. Opp. at 17. Plaintiff cites these cases for the proposition that "[d]efendants' duty of candor required them to describe all material information to the corporation's shareholders." Pl. Opp. at 17 (citing *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998)). Thus, plaintiff concludes, the Directors' failure to disclose material information—that is, the Hostetter release—constitutes reckless behavior. Plaintiff's contention again ignores the plain language of my prior opinion. The mere failure to disclose material information does not in and of itself consti-

tute reckless behavior. *See Kalnit,* at 244. In a case such as this one where the materiality of the Hostetter release is highly debatable at best, *see supra* note 7, the failure to disclose that release simply cannot lead to a finding of recklessness. *See Kalnit,* at 244; *see also L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties., Inc.,* 921 F.Supp. 1174, 1183 (S.D.N.Y. 1996) (finding plaintiff's allegations of recklessness "manifestly insufficient" because "[t]he materiality of the one alleged nondisclosure that is sufficient to survive a motion to dismiss is highly debatable, which indicates that the nondisclosure itself is not a sufficient basis from which to infer conscious misbehavior.").

Because plaintiff has again failed to plead either (i) motive and opportunity or (ii) circumstantial evidence of recklessness, he has not sufficiently alleged scienter and his section 10(b) and Rule 10b–5 claims must be dismissed pursuant to Rule 9(b) and the PSLRA.

## IV. Leave to Amend

 Under Federal Rule of Civil Procedure 15(a), "leave to amend shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). "Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a solid ground." *Oliver Sch., Inc. v. Foley,* 930 F.2d 248, 253 (2d cir.1991). "Futility" provides a solid ground on which to deny leave to amend. *See Chill,* 101 F.3d at 272; *Cortec Indus., Inc.,* 949 F.2d at 48.

 This Court has twice considered plaintiff's allegations of scienter and twice found them to be insufficient. I do not believe that plaintiff could ever successfully plead scienter in the instant case. As a result, any additional attempts to amend the complaint would be futile. Accordingly, the Amended Complaint is dismissed without leave to amend.

## V. Findings Regarding Rule 11 Sanctions

 Section 21D(c) of the PSLRA, entitled "Sanctions for abusive litigation", provides:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u–4(c)(1). If the court determines that there has been a violation of Rule 11, section 21D(c)(2) imposes mandatory sanctions and adopts a rebuttable presumption that the appropriate sanction for noncompliance "is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred." 15 U.S.C. § 78u–4(c)(3)(A)(i)–(ii). "The PSLRA thus does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found." *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 167 (2d Cir.1999). Because this dismissal with prejudice constitutes a "final adjudication" of an action arising under the PSLRA, this Court's Rule 11 findings with respect to plaintiff's complaint and Amended Complaint are set forth below.

Rule 11(b) states:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifi-

cally so identified, are reasonably based on a lack of information or belief. Fed.R.Civ.P. 11(b).

In resolving defendants' motions to dismiss, I have thoroughly reviewed plaintiff's complaint and Amended Complaint. I find no indication that Rule 11 sanctions are warranted. *First,* there is no evidence that plaintiff filed his original complaint or his Amended Complaint for "an improper purpose" such as to harass defendants or to cause unnecessary delay. *Second,* although plaintiff's original complaint for securities fraud was ultimately dismissed for failure to plead scienter, I concluded that plaintiff adequately alleged the remaining elements of a section 10(b) claim—fraudulent acts and detrimental reliance. Accordingly, I cannot find that the original complaint was wholly "frivolous".

*Third,* despite the fact that plaintiff chose to file an Amended Complaint rather than to withdraw the action following the first dismissal, sanctions for such amendment would be inappropriate here. To begin, in dismissing the original complaint, I expressly granted plaintiff leave to file an amended complaint provided he could cure the defects of the initial pleading. *See Kalnit,* 85 F.Supp.2d 232, 245. Thus, "[t]his is certainly not a case where the Court has admonished plaintiffs that Rule 11 sanctions could be imposed upon amendment." *Clifford v. Hughson,* 992 F.Supp. 661, 671 (S.D.N.Y.1998).

Finally, under the law of this Circuit, "[a]n argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness, it is clear ... that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Morley v. Ciba-Geigy Corp.,* 66 F.3d 21, 25 (2d Cir.1995) (internal quotations omitted). Although I find, for the reasons set forth above, that plaintiff's amended allegations of scienter are without merit, this does not mean that plaintiff's attempts to replead scienter were unreasonable and had absolutely "no chance" of success. The element of scienter is often the most difficult and controversial aspect of a securities fraud claim. In the instant case, plaintiff adequately pleaded that he was harmed by defendants' failure to disclose the Hostetter waiver. I cannot conclude that plaintiff's subsequent efforts to demonstrate that defendants acted with bad intent were frivolous as a matter of law.

## VI. Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted without leave to amend and without imposition of sanctions under Rule 11. The Clerk of the Court is directed to close this case.